## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Angela Block, as trustee for the next of kin
of Javis D. Adams, Jr., a minor, deceased;
Jassmine D. Adams, a minor, by her mother
and natural guardian, Angela Block; and
Angela Block, individually,

        Plaintiffs,

    v.

Toyota Motor Corporation, Toyota Motor North
America, Inc., Calty Design Research, Inc.,
Toyota Motor Engineering & Manufacturing
North America, Inc., Toyota Motor Manufacturing,
Kentucky, Inc., and Toyota Motor Sales, USA, Inc.,

        Defendants.

_____

**MEMORANDUM**
**OPINION AND ORDER**
Civil Nos. 10-2802, 10-2803, 10-2804,
and 10-2805 ADM/JSM

Catrina Trice-Adams, as trustee for the next of kin
of Javis Demar Trice-Adams, Sr., decedent; and as
next friend of J.D.T.1, a minor child; Jemara Denise
Trice, individually; and Je'Meecia Denae Trice,
individually,

        Plaintiffs,

    v.

Toyota Motor Corporation, Toyota Motor North
America, Inc., Calty Design Research, Inc.,
Toyota Motor Engineering & Manufacturing
North America, Inc., Toyota Motor Manufacturing,
Kentucky, Inc., and Toyota Motor Sales, USA, Inc.,

        Defendants.

_____

Bridgette Trice, individually and as trustee for the
heirs and next of kin of D.D.B., deceased,

Plaintiffs,

and

Koua Fong Lee, Panghoua Moua, Nhia Koua Lee,
Nong Lee, J.L, a minor child, A.P.L., a minor child,
Y.L., a minor child, and Y.L., a minor child,

Plaintiff-Intervenors,

and

American Family Mutual Insurance Company, as
subrogee of Koua Fong Lee,

Plaintiff-Second Intervenor,

v.

Toyota Motor Corporation, Toyota Motor North
America, Inc., Calty Design Research, Inc.,
Toyota Motor Engineering & Manufacturing
North America, Inc., Toyota Motor Manufacturing,
Kentucky, Inc., and Toyota Motor Sales, USA, Inc.,

Defendants.

_____

Quincy Ray Adams,

Plaintifftake,

v.

Toyota Motor Corporation, Toyota Motor North
America, Inc., Calty Design Research, Inc.,
Toyota Motor Engineering & Manufacturing
North America, Inc., Toyota Motor Manufacturing,
Kentucky, Inc., and Toyota Motor Sales, USA, Inc.,

Defendants.

_____

Amy Collignon Gunn, Esq., The Simon Law Firm, PC, St. Louis, MO, behalf of Plaintiffs in Civil No. 10-2802.

Robert J. Patterson, Esq., Anderson Patterson, PLLC, Corpus Christi, TX, on behalf of Plaintiffs in Civil No. 10-2803.

Thomas P. Cleere, Esq., Napoli Bern Ripka Shkolnik LLP, Great River, NY; Michael B. Padden, Esq., Padden & Associates, LLC, St. Paul, MN; and Kenneth R. White, Esq., Law Office of Kenneth R. White, PC, Mankato, MN, on behalf of Plaintiffs in Civil Nos. 10-2804 and 10-2805.

Robert C. Hilliard, Esq., Marion Reilly, Esq., Rudy Gonzales, Jr., Esq., John B. Martinez, Esq., and Catherine D. Tobin, Esq., Hilliard, Muñoz & Gonzales, LLP, Corpus Christi, TX; Brent Schafer, Esq., Schafer Law Firm, PA, Eagan, MN; and Kathryn Snapka, Esq., The Snapka Law Firm, Corpus Christi, TX, on behalf of Plaintiff-Intervenors.

Kevin J. Kennedy, Esq., and Forrest G. Hopper, Esq., Borgelt, Powell, Peterson & Frauen, SC, Oakdale, MN; and Lori J. Blangger, Esq., Williams & Mahony, LLC, Beverly, MA, on behalf of Plaintiff-Second Intervenors.

Theodore Dorenkamp, Esq., Bard D. Borkon, Esq., John D. Sear, Esq., Nathan J. Marcusen, Esq., and Lawrence C. Mann, Esq., Bowman and Brooke LLP, Minneapolis, MN, and Troy, MI, on behalf of Defendants.

---

# I. INTRODUCTION

On December 12, 2013, the undersigned United States District Judge heard oral argument on Defendants Toyota Motor Corp., Toyota Motor North America, Inc., Calty Design Research, Inc., Toyota Motor Engineering and Manufacturing North America, Inc., Toyota Manufacturing, Kentucky, Inc., and Toyota Motor Sales, USA, Inc.'s (collectively "Toyota" or "Defendants") Motions for Summary Judgment. Six groups of Plaintiffs and Plaintiff-Intervenors (collectively and unless more specifically stated, "Plaintiffs") filed six complaints in four lawsuits against Toyota in connection with the same underlying events. The four actions were consolidated for discovery and other pretrial purposes. See Block v. Toyota Motor Corp., No. 10-2802 (D. Minn.), Catrina Trice-Adams v. Toyota Motor Corp., No. 10-2803 (D. Minn.), Trice v. Toyota

Motor Corp., No. 10-2804 (D. Minn.), and Adams v. Toyota Motor Corp., No. 10-2805 (D.

Minn.); Order, Sept. 19, 2011 [Block Docket No. 95].[1]  Toyota filed six motions for summary

judgment: one against each group of Plaintiffs [Block Docket No. 135], [Trice-Adams Docket

No. 124], [Trice Docket Nos. 273, 274, 275], [Adams Docket No. 149].  Plaintiffs filed a

consolidated response in opposition to these motions.  See Pls.' Resp. Opp'n to Summ. J. [Block

Docket No. 147] ("Pls.' Opp'n") (identical brief filed in each action).  Toyota also filed a

consolidated motion to exclude the expert testimony of John Stilson [Block Docket No. 130],

which Plaintiffs opposed in a consolidated response [Block Docket No. 144] (identical briefs

filed in each action).  For the reasons stated herein, Toyota's motions for summary judgment are

granted in part and denied in part, and its motion to exclude expert testimony is denied.

## II.  BACKGROUND[2]

In February 2006, Koua Fong Lee ("Lee") purchased a used 1996 Toyota Camry from a

private party.  The car had been driven about 173,000 miles at the time of purchase.  Marion

Reilly Decl. [Trice Docket No. 313] Ex. 7 ("Lee Dep.") 14-15.

On June 10, 2006, Lee was driving the Camry to Saint Paul after attending a graduation

ceremony at a church in Minneapolis.  In the car with Lee were his then-pregnant wife,

Panghoua Moua, his daughter J.L., his brother, Nong Lee, and his father, Nhia Koua Lee.  Id. at

65-66.  As Lee proceeded up the Snelling Avenue exit ramp from Interstate 94, he alleges

pressing the brake pedal, only to find the brakes unresponsive.  Id. at 71-72.  The Camry

---

[1]  Citations to the respective dockets of these actions will take the following form: [Block Docket No. 1], [Trice-Adams Docket No. 1], [Trice Docket No. 1], and [Adams Docket No. 1].

[2]  The Court views all inferences drawn from the facts in the light most favorable to the parties opposing summary judgment.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

continued up the ramp and struck the rear of an Oldsmobile Ciera at a high rate of speed.  The

Ciera, which was stopped at the red light at the top of the ramp, received severe structural

damage and was forced into oncoming traffic.  Pls.' 2d Am. Compl. [Block Docket No. 103]

("Block Compl.") ¶¶ 23-27.  Later estimates were the Camry was traveling at about 90 miles per

hour at the time of the collision.  Id. ¶ 28.

Javis Trice-Adams was the driver of the Ciera at the time of the accident.  In the Ciera

with him were Quincy Ray Adams, an adult, as well as Javis Adams, Jr., Jassmine Adams, and

Devyn Bolton, all minors.  Javis Trice-Adams and his passengers belonged to the same extended

family and were en route to a St. Paul home to install a washer and dryer.  Block Compl. ¶¶ 20-

21.  Javis Trice-Adams and his son, Javis Adams, Jr., died at the scene of the collision.  Jassmine

and Quincy Adams suffered serious and permanent injuries, but survived.  Bolton, six years old

at the time, was rendered a quadraplegic and subsequently died in October 2007.  Pls.' 2d Am.

Compl. [Trice-Adams Docket No. 165] ("Trice-Adams Compl.") ¶ 17.

Following the accident, Lee was charged with seven counts of vehicular homicide and

injury, and one count of careless driving.  Block Compl. ¶ 34.  Although Lee testified at trial that

the Camry's brakes had stopped working, a jury convicted Lee on all counts.  In October 2007,

the state court sentenced Lee to eight years in prison.

In 2009 and 2010, Toyota issued recalls for vehicles with "unintended acceleration."

These recalls did not include Lee's 1996 Camry, but nevertheless reignited interest in his defense

that a car defect had caused the accident.  Lee filed a petition for post-conviction relief, and the

court granted Lee an evidentiary hearing.  The three-day hearing included the testimony of

eleven 1995 and 1996 model Camry owners who had also experienced unintended acceleration.

Block Compl. ¶¶ 33-51.  At the end of the hearing, the court granted Lee's petition and vacated

his convictions.  The county attorney decided not to appeal or re-file criminal charges, and Lee was released from prison after over two years of incarceration.  Id. ¶ 52.

In June 2010, Plaintiffs Angela Block ("Block"), Catrina Trice-Adams ("Trice-Adams"), Bridgette Trice ("Trice"), and Quincy Adams ("Adams") filed the present actions in state court.[3] These Plaintiffs brought individual claims as well as claims in their capacities as trustees for the next of kin of the deceased.  On June 30, 2010, Toyota removed all four actions to federal court.

On October 25, 2010, Lee, and his family ("Plaintiff-Intervenors") moved to intervene. Plaintiffs did not oppose intervention, and Toyota ultimately stipulated that Lee and his family could permissively intervene in the Trice action and file claims against Toyota [Trice Docket No. 61].  In January 2011, Toyota also stipulated that Lee's insurance company, American Family Insurance Company ("American Family"), could intervene in the Trice action as Lee's subrogee [Trice Docket No. 78].

As amended, Plaintiffs' complaints state several similar claims against Toyota.  Plaintiff Block is the mother of Jassmine Adams, and brings claims for: (1) design defect, (2) failure to warn, and (3) negligence against Toyota on Jassmine Adams' behalf.  Block was also the mother of Javis Adams, Jr., and brings the same claims as trustee for the next of kin of Javis Adams, Jr., through Minnesota's wrongful death statute, Minn. Stat. § 573.02.

Plaintiff Trice-Adams, Javis Trice-Adams' widow, brings claims as trustee for Javis Trice-Adams' next of kin.  Trice-Adams alleges wrongful death claims based on: (1) design

---

[3] Unless otherwise stated, references to Plaintiffs will include their family members who are also parties.

defect, (2) failure to warn, and (3) negligence.[4]  She also alleges a claim for (4) negligent

infliction of emotional distress on behalf of herself and her children.

Plaintiff Trice brings wrongful death claims as trustee for the next of kin of her daughter,

Bolton.  Trice alleges claims of: (1) design defect, (2) failure to warn, and (3) negligence.

Plaintiff-Intervenors Lee and his relatives bring claims for: (1) design defect, (2) failure

to warn, (3) negligence, (4) fraud/misrepresentation, and (5) negligent infliction of emotional

distress.

Plaintiff-Second Intervenors American Family brings claims for: (1) design/manufacture

defect, (2) failure to warn, and (3) negligence.

Finally, Plaintiff Quincy Adams, a survivor of the accident, brings claims for: (1) design

defect, (2) failure to warn, and (3) negligence.

## III.  DISCUSSION

### A.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary

judgment if no genuine issue as to any material fact exists and the moving party is entitled to

judgment as a matter of law.  "While a party moving for summary judgment has the burden of

showing that there is no genuine issue of fact for trial, a nonmoving party seeking to avoid

having summary judgment entered against it may not rest on mere allegations or denials, but

---

[4]  Catrina Trice-Adams and Bridgette Trice allege stand-alone causes of action for wrongful death.  Trice-Adams Compl. ¶¶ 87-89; 3d Am. Compl. [Trice Docket No. 175] ("Trice Compl.") ¶¶ 101-103.  As discussed below, a wrongful death claim does not serve as an independent cause of action so much as the mechanism by which a decedent's surviving next of kin may bring personal injury claims the decedent would otherwise have been able to bring himself.  See id. § 573.02, subd. 1.  Thus, Catrina Trice-Adams and Bridgette Trice's claims for strict product liability and negligence are treated as wrongful death claims, and the stand-alone wrongful death claims are dismissed.

must set forth specific facts sufficient to raise a genuine material issue for trial." <u>Thomas v. Runyon</u>, 108 F.3d 957, 959 (8th Cir. 1997).

A fact dispute is "material," and will thus preclude summary judgment, only if the dispute "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). And where the moving party has carried its burden, the nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. The "very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56(e) advisory committee's note to 1963 Amendment.

## B.  Statute of Limitations

### 1.  Wrongful Death Claims

Plaintiffs Block, Trice-Adams, and Trice allege wrongful death claims based on theories of design defect, failure to warn, and negligence. Minnesota law states that a cause of action arising out of a personal injury "dies with the person of the party in whose favor it exists." Minn. Stat. § 573.01; <u>see also</u> <u>Ortiz v. Gavenda</u>, 590 N.W.2d 119, 121 (Minn. 1999) (holding that under the common law, "a claim for personal injuries died with the victim"). But § 573.02 allows a cause of action to be brought:

> When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission.

Thus, where a personal injury claim, such as a strict product liability or negligence claim, would have otherwise "died" with the injured person, the wrongful death statute allows a duly-appointed trustee to bring the claim on the decedent's behalf. Because a wrongful death claim is

"purely statutory" and "in derogation of the common law," courts must strictly construe the wrongful death statute's requirements.  Ortiz, 590 N.W.2d at 121-22.  This includes the wrongful death statute of limitations.  Id. at 122-23.

### a.  Bridgette Trice

Trice's claims must be addressed separately from those brought by Block and Trice-Adams.  Trice brings claims as trustee for the heirs and next of kin of Devyn Bolton.  As previously noted, the June 10, 2006, collision rendered Bolton a quadriplegic, and Bolton died over a year later, in October 2007.  In its memorandum supporting summary judgment, Toyota addresses Trice's claims as though they were standard strict product liability claims.  Because Devyn Bolton was injured on June 10, 2006, Toyota argues the four year strict liability statute of limitations began running on that date.  Trice did not serve Toyota Motor Engineering and Manufacturing, North America, Inc. and Toyota Motor Manufacturing, Kentucky, Inc. until July 9, 2010, and she did not serve Toyota Motor Corporation until July 14, 2010.  Bard Borkon Decl. [Trice Docket No. 283] Ex. 26.  As a result, Toyota argues Trice's claims for design defect and failure to warn are time-barred as to these three Defendants.

 Toyota ignores the wrongful death statute of limitations.  There is no dispute that Trice brings her design defect and failure to warn claims as the duly-appointed trustee for Bolton's next of kin.  As Toyota itself notes, such claims would not have survived beyond Bolton's death unless brought under the wrongful death statute.  In addition, Trice alleges "wrongful death" as the first count in her complaint: a clear indication she intends to seek wrongful death liability. As a result, Trice's claims must be viewed as wrongful death claims based in strict product liability theories, and the wrongful death statute of limitations applies.

The wrongful death and strict product liability statutes of limitation intersect in a relatively murky area of Minnesota law.  Viewed alone, the wrongful death statute of limitations would allow Trice to timely bring claims until October 2010: three years after Bolton's death.  But this means Trice could bring strict product liability claims on behalf of Bolton at a time when Bolton, had she lived, could not have brought the claims herself.  Put another way, if Bolton had lived and served process in July 2010 (as Trice did with respect to certain Defendants), Bolton's claims would be time-barred under the strict product liability's four year statute of limitations.  Minn. Stat. § 541.05, subd. 2.

At least one decision in this district has held against allowing the wrongful death statute of limitations to trump the strict liability statute of limitations.  In Tuttle v. Lorillard Tobacco Co., 118 F. Supp. 2d 954, 961 (D. Minn. 2000) (Magnuson, J.), the court held that Minn. Stat. § 573.02 "expressly precludes the revival of actions that would have been time-barred if brought by the decedent had he lived." Id. at 961-62.  In support of its conclusion, the court cited the Minnesota Supreme Court's decision in DeRogatis v. Mayo Clinic, 390 N.W.2d 773, 776 (Minn. 1986), a wrongful death case based on allegations of medical malpractice.  The DeRogatis court held that a wrongful death claim based on medical malpractice begins running "not on the date of death, but when the limitation period for the underlying claim of medical malpractice by the decedent began to run." Tuttle, 118 F. Supp. 2d at 962 (citing DeRogatis, 390 N.W.2d at 776).

This Court respectfully disagrees with the holding in Tuttle because it renders a portion of the wrongful death statute, Minn. Stat. § 573.02, superfluous.  A plain reading of § 573.02 indicates the Minnesota legislature intended to treat intentional homicide and medical malpractice claims differently from all other personal injury torts, because the statute provides

specific time limitations for these two torts, and a general limitation for all others.  Regarding

medical malpractice, the statute states:

> An action to recover damages for a death caused by the alleged
> professional negligence of a physician, surgeon, dentist, hospital or
> sanitarium, or an employee of a physician, surgeon, dentist, hospital
> or sanitarium shall be commenced within three years of the date of
> death, but in no event shall be commenced beyond the time set forth
> in section 541.076 [governing medical malpractice claims generally].

For all other wrongful death claims, the statute states that an action "may be commenced within

three years after the date of death provided that the action must be commenced within six years

after the act or omission."[5]

The difference between these two limitations is clear.  The Minnesota legislature

expressly limited wrongful death claims based on medical malpractice by expressly citing the

medical malpractice statute of limitations.  Thus, for this specific tort, the wrongful death statute

does indeed "preclude the revival" of a claim that would have otherwise expired had the injured

person lived.  However, the statute provides no similar statute citations or references for other

torts.  The wrongful death statute does not say that a general tort action "may be commenced

within three years after the date of death provided that the action <u>must be commenced within the

time set forth by the underlying tort's statute of limitations</u>."  Instead, the statute states an

unambiguous limitation for all general tort claims, and makes no reference to applying specific

statutes of limitation.  <u>See</u> <u>Ford v. Emerson Elec. Co.</u>, 430 N.W.2d 198, 200-01 (Minn. Ct. App.

1988) ("The wrongful death statute of limitations provision is intended to be a catch-all

---

[5]  The Minnesota legislature amended § 573.02 in 2002.  At the time <u>Tuttle</u> was issued,
and <u>DeRogatis</u> before it, the statute allowed a trustee to bring a medical malpractice claim in
accordance with the general medical malpractice statute of limitations.  As amended, § 573.02
now states medical malpractice claims must be brought within three years of death but no later
than when a medical malpractice claim may be normally filed.  In either version of the statute,
medical malpractice claims are addressed separately from general tort claims.

provision for wrongful death actions not specifically mentioned elsewhere in section 573.02, and it is therefore by its nature general."). The conclusion, based on the plain language of the statute, must be that the wrongful death statute of limitations supersedes the statute of limitations for underlying tort claims.

Several aspects of Minnesota law support this conclusion. First, as discussed, the wrongful death claim is created purely by statute. See Rugland v. Anderson, 15 N.W. 676 (Minn. 1883) (addressing predecessor of § 573.02). The claim underlying the wrongful death action extinguishes upon the death of the injured person, and presumably, so too does the applicable statute of limitations. In a wrongful death action, claims exist only by virtue of § 573.02, and must accordingly be governed by the statute.

Second, applying statutes of limitation from underlying tort claims to the wrongful death statute would make the wrongful death statute's six year limitation superfluous. As written, the statute provides a trustee three years from the date of death to file a claim, with a "maximum" time limit of six years from the "wrongful act or omission." Imposing, for example, the strict product liability statute of limitations onto the wrongful death statute would render this six year limitation superfluous, because a trustee would be time-barred from bringing claims three years from the decedent's death, but no later than four years from the date the injury accrued. See Medalen v. Tiger Drylac U.S.A., Inc., 269 F. Supp. 2d 1118, 1122 (D. Minn. 2003) (strict product liability claims accrue upon injury).

Third, unlike certain tort claims, wrongful death claims do not have the benefit of the "discovery rule." For certain torts, including product liability claims, a cause of action does not accrue until there is a "physical manifestation" of the injury and evidence connecting the injury to the product, act, or omission at issue. Huggins v. Stryker Corp., 932 F. Supp. 2d 972, 984 (D.

Minn. 2013).[6]  The discovery rule does not apply to wrongful death claims because "the fact of

death itself" should "indicate a starting point for inquiry regarding a cause of action for wrongful

death."  DeCosse v. Armstrong Cork Co., 319 N.W.2d 45, 51 (Minn. 1982) (citation omitted).

Imposing the strict liability statute of limitations onto the wrongful death statute would not only

curtail the time available to bring a wrongful death claim, it would deny wrongful death

claimants any allowance for hidden causes of injury: injuries living claimants could discover and

for which they could pursue relief.

Given the analysis above, the wrongful death statute of limitations, by itself, will apply to

Trice's claims.  Accordingly, Trice had until October 2010 to file her action, and she served

Defendants by July 2010.  As a result, Trice's claims are not time-barred.

### b.  Javis Adams, Jr., and Javis Trice-Adams

Toyota argues the statute of limitations bars the wrongful death claims brought on behalf

of Javis Adams, Jr., and Javis Trice-Adams.  The time to bring wrongful death claims, Toyota

contends, began running on June 10, 2006, the date of the accident and when Javis Adams, Jr.,

and Javis Trice-Adams both died.  Plaintiffs did not file their lawsuits until four years later, in

June 2010, a year after the statute of limitations expired.  In response, Plaintiffs do not dispute

that Block and Trice-Adams' wrongful death claims are subject to a three year statute of

limitations.  Instead, Plaintiffs argue Toyota fraudulently concealed Plaintiffs' strict liability and

negligence causes of action, meaning the wrongful death statute of limitations was tolled.

Fraudulent concealment has "no categorical definition."  Wild v. Rarig, 234 N.W.2d 775,

795 (Minn. 1975).  In the product liability context, fraudulent concealment "tolls the statute of

---

[6]  For further discussion regarding the discovery rule in Minnesota law, see Section
III.B.2., below.

limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." Klehr v. A.O. Smith Corp., 87 F.3d 231, 237 (8th Cir. 1996) (citations omitted). To establish fraudulent concealment, some courts have stated a two element test, requiring the plaintiff to establish: "1) that the Defendant engaged in a course of conduct to conceal evidence of the Defendant's alleged wrongdoing; and 2) that the Plaintiff failed to discover the facts giving rise to her claim despite her exercise of due diligence." Evans v. Rudy-Luther Toyota, Inc., 39 F. Supp. 2d 1177, 1184 (D. Minn. 1999); see also William v. Prasiunas, 661 N.W.2d 645, 650 (Minn. Ct. App. 2003) (stating similar three element test). The concealment "must be fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." Wild, 234 N.W.2d at 795 (citation omitted). "[M]ere silence" or a "failure to disclose" is not affirmative concealment. Id.

Plaintiffs have failed to establish fraudulent concealment. Although Plaintiffs may have demonstrated a viable question of fact with regard to whether Toyota had knowledge of unintended acceleration in 1996 Camrys, Plaintiffs have not demonstrated an affirmative act of concealment by Toyota, nor have they pled their allegations with particularity.

### i. Affirmative Concealment

Plaintiffs submit affidavits and depositions in support of their argument that a design defect existed in the 1996 Camry, and Toyota knew about the defect. Plaintiffs cite the testimony of several 1995 and 1996 Camry drivers who experienced unintended acceleration and then reported the unintended acceleration to a Toyota dealership. See Reilly Decl. Ex. 22 (Constantino Aff.) ("This time, we had it towed to a Toyota dealership."); Ex. 39 (Broeker Aff.) ("After this incident, as well as another similar incident . . . my husband brought it into a Toyota

dealership. . . . The dealership called in a regional manager"); Ex. 28 (Jaeger Dep.) at 94 ("And,

then, I drove into the dealership. But it happened on the way there. So, I drove right there while

it was happening."); Ex. 27 (Campbell Dep.) at 35 ("And then when the incident actually

happened, I did call the dealership"); see also Ex. 24 (Falcehetti Dep.); Ex. 31 (Poss Dep.); Ex.

25 (Frazier Dep.); Ex. 42 (Gathright, Jr. Dep.). Plaintiffs also submit additional deposition

testimony and affidavits indicating other owners experienced unintended acceleration but did not

report these issues to a Toyota dealership or to Toyota directly. See, e.g., id. Ex. 21 (Neumeister

Dep.); Ex. 33 (Thomson Dep.); Ex. 26 (Galley Dep.).

Plaintiffs also allege that in several instances, Toyota received direct knowledge of

unintended acceleration events in 1995 and 1996 Camrys. In at least two instances, owners of

1996 Camrys reported their unintended acceleration incidents directly to Toyota Corporation or

one of its subsidiaries, rather than only reporting to their local dealership. Id. Ex. 50 (Ferguson

Dep.) at 6; Ex. 32 (Powers Dep.) at 115-116 ("I was trying to describe the problem . . . and to

make sure they were aware of it"). Another owner's mechanic reported the problem directly to

Toyota. Id. Ex. 43 (Lupo Aff.) ("The mechanic notified Toyota but there was no recall."). In

their pleadings, Plaintiffs also identify eight instances in which owners of 1995 and 1996

Camrys filed complaints with the National Highway Traffic Safety Administration ("NHTSA")

about unintended acceleration events. See Trice Compl. ¶ 71. These allegations of Plaintiffs'

refer to publicly-available documents, though no evidence suggests the NHTSA took any action

in response to the complaints.

Even if the above evidence demonstrated a question of fact with regard to Toyota's

knowledge of unintended acceleration in 1996 Camrys, Plaintiffs have not similarly

demonstrated that Toyota took an "affirmative" action to conceal the alleged defect from

Plaintiffs.  Essentially all of the evidence Plaintiffs cite in this regard relates to the 2009 and

2010 recalls for Toyota vehicles, recalls which centered on designs and technology not at issue

in the 1996 Camry design.  For example, Plaintiffs cite a letter written by United States

Representative Henry Waxman and former Representative Bart Stupak, in which the

congressmen concluded, "[a]pproximately 70% of the sudden unintended acceleration events in

Toyota's own customer call database involved vehicles that are not subject to the 2009 and 2010

floor mat and 'sticky pedal' recalls."  Reilly Decl. Ex. 45.  But Plaintiffs selectively quote this

letter.  The full context of the letter makes clear that the congressmen are addressing complaints

received from consumers "since 2000," and which are primarily related to "electronic throttle

controls" developed around that time.  Id. at 2-3.

Plaintiffs also cite a Bloomberg News article, among other news articles, which reports

Toyota's efforts to manage or limit the 2009 and 2010 recalls and investigations.  Id. Ex. 17.

The article states Toyota hired at least two former regulators from the NHTSA to lobby against

launching additional investigations into Toyota cars, and that the resulting requirement of two

recalls was a relatively manageable outcome.  See id.  But the cited news article discusses only

cars and investigations dating back to 2002; it does not discuss 1995 or 1996 Camrys or related

investigations.  Plaintiffs also cite congressional testimony discussing a Toyota internal memo,

in which Toyota described its efforts to limit investigations as "Wins for Toyota."  Id. Ex. 48, at

13.  Again, this testimony pertains to the 2009 and 2010 recalls.

This evidence does not demonstrate a genuine question of fact for fraudulent

concealment.  To successfully toll a statute of limitations, the alleged fraudulent concealment

must be shown to have "something of an affirmative nature designed to prevent, and which does

prevent, discovery of the cause of action."  Wild, 234 N.W.2d at 795.  Toyota argues that

Plaintiffs' submitted press articles, congressional testimony, and other public documents are hearsay and impermissible "character" evidence against Toyota.  But Plaintiffs' evidence fails to establish a question of fact for a much more basic reason: it lacks probative value.  See 22A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, Federal Rules of Evidence § 5233 (2d ed.) (expressing skepticism as to whether corporations may have "character" for purposes of Rule 404(b) of the Federal Rules of Evidence, and finding relevance a better guide).  The second-hand reports Plaintiffs submit regarding Toyota's efforts to stymie investigation and limit recalls relate exclusively to cars designed in 2000 or later.  Nowhere in the record have Plaintiffs submitted evidence that specifically demonstrates Toyota's actions to conceal the alleged defect in the 1996 Camry.  Plaintiffs' counsel cannot rely on unrelated investigations, recalls, and press coverage to relieve them of their duty to conduct targeted discovery on behalf of their clients.

Plaintiffs further claim Toyota made several false statements reassuring the public that Toyota cars were safe, and that these statements implicitly applied to the 1996 Camry.  In connection with the 2009 and 2010 recalls, Toyota CEO Akio Toyoda made statements such as, "Toyota is committed to safety" and told consumers Toyota cars "will be even safer."  Reilly Decl. Exs. 18, 19.  Similarly, Jim Lentz, an executive with Toyota Motor Sales, USA, Inc. stated in a radio interview in 2010 that "I can tell you I wouldn't have loved ones in [Toyota vehicles] if I didn't think they were safe."  Id. Ex. 20.

Again, these general statements made by Toyota in connection with the 2009 and 2010 recalls do not demonstrate a specific attempt to conceal Plaintiffs' causes of action for a defect in the 1996 Camry.  A plaintiff may establish fraudulent concealment by showing a defendant made misleading partial disclosures or by denying knowledge of an alleged defect.  See Marvin

Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 877 (8th Cir. 2000) (holding

"[m]isleading partial disclosures" may constitute fraudulent concealment); DeCosse, 319

N.W.2d at 51 ("false denial of knowledge" may constitute fraudulent concealment).  Here,

however, Plaintiffs offer no evidence that these general statements were "designed to prevent"

the discovery of Plaintiffs' causes of action.  Wild, 234 N.W.2d at 795.  Nor have Plaintiffs

demonstrated how these statements actually concealed their causes of action.  See Williamson,

661 N.W.2d at 650.  While Lee testified that he read or heard advertisements regarding the

general safety of Toyota cars, neither Lee nor the other Plaintiffs have stated that they heard

Toyota's assurances in connection with the 2009 and 2010 recalls.

Finally, Plaintiffs also submit two exhibits directly from Toyota.  Plaintiffs submit an

email dated January 16, 2010, in which Irv Miller, an executive with Toyota Motor Sales, Inc.,

wrote:

> "I hate to break this to you but WE HAVE A tendency for
> MECHANICAL failure in accelerator pedals of a certain
> manufacturer on certain models.  We are not protecting our customers
> by keeping this quiet.  The time to hide on this one is over.  We need
> to come clean and I believe that Jim Lentz and Yoshi are on the way
> to DC for meetings with the NHTSA to discuss options.

Id. Ex. 16 (the "Miller Email").  In response, another executive wrote the "mechanical failures of

acc. pedal" should not be discussed until the "real cause of the sticking" is "clarified."  Id.

Plaintiffs also submit a "University of Toyota" training video from February 2010 in which a

trainer states that in a carbureted car, the "throttle linkage—or cable between the accelerator

pedal and carburetor—can bind or break," causing the throttle to "stick open."  Id. Ex. 15.

Plaintiffs concede that this video does not refer to the 1996 Camry, but nevertheless argue it

implies Toyota knew of the possibility of acceleration-related problems generally by the time it

designed the 1996 Camry.

Neither of these exhibits establishes fraudulent concealment.  Toyota stated at oral argument that the Miller Email reflected a communication made in connection with the 2009 and 2010 recalls.  Plaintiffs responded that Miller made no specific reference to a year, and that the term "mechanical failure" could possibly reflect discussion of the 1996 Camry, a car manufactured and sold nearly 14 years before the date of the Miller Email.  Plaintiffs' interpretation makes the Miller Email applicable to any Toyota car, made in any year, that had any kind of accelerator pedal defect.  Although the Court must draw all reasonable inferences in Plaintiffs' favor, Plaintiffs' suggested inference is unreasonably speculative.  Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009) ("Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to "accept unreasonable inferences or sheer speculation as fact.") (citation omitted).  Plaintiffs offer absolutely no evidence providing any context to this email, and no reasonable jury could conclude the email specifically reflects Toyota's efforts to conceal a defect in the 1996 Camry.  Similarly, the "University of Toyota" video does not support fraudulent concealment.  As Toyota argues, this video pertains to outmoded technology that Plaintiffs themselves concede is not at issue in this case.  See Pls.' Opp'n at 30.

### ii.  Particularity

Toyota argues Plaintiffs' fraudulent concealment argument must fail because Plaintiffs did not plead with particularity, as required in the Court's June 13, 2011, Order requiring Plaintiffs to identify which Defendants engaged in what conduct.  See Block, 795 F. Supp. 2d 880, 889-90 (D. Minn. 2011).

Plaintiffs have to failed to allege fraudulent concealment with particularity.  Plaintiffs have not delineated, in any manner, which Toyota Defendants engaged in which alleged acts of

fraudulent concealment.  Although Defendants are indeed closely related, as the Court previously held, Eighth Circuit law is unsettled as to what degree of specificity is required in alleging against several members of a corporate family.  See Block, 795 F. Supp. 2d at 889-90. As a result, the Court specifically directed Plaintiffs to plead fraudulent concealment with greater specificity, and Plaintiffs failed to do so.  This failure, combined with Plaintiffs' failure to submit relevant evidence specifically demonstrating fraudulent concealment, has failed to place Toyota on notice as to its acts of fraudulent concealment, and denied Toyota an opportunity to respond accordingly.

In sum, both Javis Trice-Adams and Javis Adams, Jr., died in a tragic rear end collision while in the Ciera, and while it was stopped.  Although they were entirely blameless in the circumstances surrounding the accident, the trustees of their estates did not bring actions until a year after the statute of limitations for wrongful death claims had expired.  To avoid the seemingly harsh result of their heirs' claims being time-barred, Plaintiffs' counsel needed to submit evidence raising a genuine question of fact as to whether Toyota affirmatively acted to conceal the alleged defect in the 1996 Camry.  There is no evidence to support such a conclusion; the wrongful death claims of Block and Trice-Adams must be dismissed.

## 2.  Strict Product Liability Claims and Discovery Rule

Plaintiffs Block (on behalf of Jassmine Adams) and Quincy Adams, Plaintiff-Intervenors, and American Family seek damages for strict product liability based on claims of design defect and failure to warn.  See Block Compl.; Adams Compl.; 1st Am. Compl. [Trice Docket No. 325] ("Lee Compl.") (under seal); 2d Am. Compl. [Trice Docket No. 164] ("American Family Compl.").

Toyota argues these claims are all time-barred under the strict products liability statute of limitations.  Minn. Stat. § 541.05 places a four year limitation on strict liability claims, which courts have interpreted as running from the date the plaintiff suffers "some damage as a result of the alleged negligence."  Klempka v. G.D. Searle & Co., 963 F.2d 168, 170 (8th Cir. 1992).  Accordingly, Toyota argues the statute of limitations on Plaintiffs' strict liability claims began running on the date of the accident, and expired exactly four years later, on June 10, 2010.  Under this calculation, Toyota argues Plaintiffs Block, Trice, and Adams all failed to timely serve several, but not all, of the Toyota Defendants.[7]  Thus, Toyota seeks the dismissal of these Plaintiffs' claims as to the relevant Defendants.  In addition, Toyota argues the strict liability claims brought by Plaintiff-Intervenors and by American Family should be dismissed because they did not move to intervene until November 15, 2010, and January 13, 2011, respectively.[8]

In addition to fraudulent concealment tolling the statute of limitations, Plaintiffs argue the discovery rule prevented their strict liability causes of action from accruing until at a time later than immediately after the accident.  Under the discovery rule, a product liability cause of action does not accrue until two elements are met: "(1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and

---

[7]  Block served Toyota Motor Corporation on July 7, 2010.  Borkon Decl. Ex. 19.  Trice served Toyota Motor Corporation on July 14, 2010, and she served Toyota Motor, North America, Inc., Toyota Motor Engineering and Manufacturing North America, Inc., and Toyota Manufacturing, Kentucky, Inc. on July 9, 2010.  Id. Ex. 26.  Adams served Toyota Motor Corporation on July 14, 2010, and he served Toyota Motor Engineering and Manufacturing North America, Inc., and Toyota Manufacturing, Kentucky, Inc. on July 9, 2010.  Id. Ex. 15.

[8]  Toyota also argues American Family's claims should be time-barred because it failed to serve a summons on Defendants.  This argument is not persuasive.  Toyota not only stipulated to the filing of American Family's complaint-in-intervention, each Defendant received service of the Complaint through the District of Minnesota's electronic filing system.  See Compl. [Trice Docket No. 80] Attachment 1.

the defendant's product, act, or omission." Hildebrandt v. Allied Corp., 839 F.2d 396, 398 (8th Cir. 1987). Although there is some tension between Hildebrandt and certain Minnesota state court decisions, federal courts in this district have continued to apply the discovery rule. Compare MacRae v. Grp. Health Plan, Inc., 753 N.W.2d 711, 719 (Minn. 2008) (holding cause of action accrues when "some" compensable damage occurs) with Huggins, 932 F. Supp. 2d at 985 (holding Minnesota courts have not repudiated Hildebrandt and further finding basis for discovery rule in Minnesota law) (citations omitted).

In Hildebrandt, the Eighth Circuit held that a plaintiff's subjective suspicion of injury is insufficient to give rise to a cause of action, especially where others refuse to confirm or outright deny the suspicion. Hildebrandt, 839 F.2d at 399 (citing, in part, Brazzell v. United States, 788 F.2d 1352 (8th Cir. 1986)). The Eighth Circuit explained that if a plaintiff files suit based on mere suspicions, and the defendant or others deny the suspicion, the trial court could find the claims frivolous, or a jury could find the claims unfounded. The plaintiff would then be barred from filing a later claim when he obtains knowledge that his claim, in fact, had a reasonable basis. Such an approach to product liability would "provoke the premature commencement of claims for temporary sickness or discomfort." Id. A plaintiff should instead be "entitled to wait until the cause has been rationally identified." Id.

Block, Adams, Plaintiff-Intervenors, and American Family have demonstrated questions of fact with regard to the discovery rule. Toyota left Lee's product defect theory unconfirmed during his criminal trial, and a jury outright rejected Lee's defense. Thereafter, Lee, who was in the best position to investigate the defect, was imprisoned for two years. To perhaps an even greater degree than the plaintiffs discussed in Hildebrandt and Brazzell, Lee's criminal trial could have reasonably led Plaintiffs to believe no cause of action existed. If Lee or the other

Plaintiffs had filed civil claims immediately after Lee's imprisonment, it is plausible the court would have dismissed their claims as frivolous, or that a jury would have found no basis for liability.

Drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have established a genuine issue of fact with regard to whether Plaintiffs should have known about the causal relationship between the alleged defect and the subsequent injury.  As such, Block, Trice, Adams, Plaintiff-Intervenors, and American Family have timely stated their claims for strict product liability.

**C.  Motion to Exclude Stilson's Testimony**

The parties have inextricably intertwined their design defect arguments with the admissibility of the testimony of John Stilson, Plaintiffs' expert witness.  As a result, Toyota's motion to exclude Stilson's testimony is addressed before reaching the issue of summary judgment on Plaintiffs' strict liability claims.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. In short, the rule states a qualified witness may offer opinions or other testimony based on scientific, technical, or specialized knowledge.  The testimony must be based on sufficient facts or data, be the product of reliable principles and methods, and reflect a reliable application of those methods to the facts of the case.  Fed. R. Evid. 702.  Rule 702 reflects but does not codify the holding of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and the cases interpreting Daubert, including Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  Fed. R. Evid. 702 advisory committee's note.

Under Daubert, trial courts act as "gatekeepers" to ensure: the proposed expert testimony is useful to the factfinder in deciding the ultimate fact issue; the expert witness is qualified; and

the proposed testimony is "reliable or trustworthy in an evidentiary sense. . . ." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  In addition to Rule 702, trial courts may consider several factors set out by Daubert for determining reliability, including: (1) whether the theory can be (and has been) tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory enjoys general acceptance in the relevant scientific community.  Daubert, 509 U.S. at 593-94.

No single factor is determinative.  Instead, the trial court must evaluate reliability in a flexible manner, as the Daubert factors may not necessarily apply "to all experts or in every case."  Kumho, 526 U.S. at 141.  Thus, the trial court has broad discretion not only in ultimately determining reliability, but also in how it determines reliability.  Id. at 142.  Finally, the trial court should generally resolve doubts about the usefulness of an expert's testimony in favor of admissibility.  Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758 (8th Cir. 2006).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001).

Stilson is a consulting engineer in the automotive safety field.  Stilson has a masters of science in mechanical engineering, has attended courses in accident reconstruction, and has published articles regarding automotive accidents.  Until about 1983, Stilson worked as a mechanical engineer and car designer for Ford Motor Co., Chrysler Corp., and other companies. See Amy Gunn Decl. [Block Docket No. 145] Ex. 4.  In 1983, Stilson began working as a consultant in "safety engineering" related to vehicles and machinery, which he continues to do today.

Stilson offers opinions in three main areas of this case.  First, Stilson opines Toyota defectively designed the cruise control apparatus in Lee's Camry.  Second, Stilson concludes Lee could not have caused the accident by inadvertently pressing the accelerator pedal instead of the brake pedal.  Finally, Stilson opines the brakes in Lee's Camry also malfunctioned, thus allowing the car to rapidly accelerate despite Lee's claim that he applied the brakes.

### 1. Cruise Control Throttle Assembly Defects

Stilson opines that the accident was primarily caused by a defect in the "inboard and outboard pulleys of the Camry's cruise control systems."  See id. Ex. 3 ("Stilson Dep.") at 132-33.  In the 1996 Camry, a cable runs from the gas pedal through two plastic pulleys used to connect the cable to the cruise control assembly.  See Bard Borkon Decl. Supp. Stilson Exclusion [Block Docket No. 133] Ex. 5 ("Stilson Report") at 3-4; Gunn Decl. Ex. 2 ("Stilson Supp. Report") at 1-2.  In his reports, Stilson states that when the cruise control assembly, which is housed in a plastic casing, is exposed to heat, the heat causes the plastic pulleys to "stick," and thus cause the throttle to remain open.  Stilson Supp. Report at 3-4.  Stilson further opines that the design of these pulleys, and the bracket holding them in place, warped over time.  This caused a misalignment of the cable, which exacerbated the heat-based throttle malfunction. Stilson Supp. Report at 1-3.

### a. Testing

Toyota argues that Stilson's opinion with regard to "thermal effects" on the cruise control assembly must be excluded because they are based on faulty tests.  Specifically, Toyota argues Stilson's application of heat—blowing hot air with a hairdryer—proved imprecise, meaning Stilson determined that the throttle would stick open only when it reached 150 to 165 degrees Farenheit.  See Stilson Dep. 161-162.  In addition, Stilson did not offer an opinion as to how the

cruise control assembly would reach those temperatures in normal operation.  Perhaps more problematically, argues Toyota, Stilson mechanically altered the cruise control mechanism by moving a cruise control bracket out of its factory-configured position.  The lever was moved out of position for four out of the five tests Stilson conducted.  Stilson Dep. 161-62.  In all of the tests in which the bracket was moved, the throttle became stuck upon the application of heat.  Id. In the fifth test, when the bracket was returned to its factory-set position, the throttle did not stick.  Stilson Dep. 169-70.  Toyota contends that instead of showing a defect, the tests confirm the Camry works properly when in its original design configuration.

Plaintiffs argue Stilson's testing is both reliable and probative.  Stilson has extensive experience in vehicle design and testing, Plaintiffs argue, and thus may use theoretical or independently designed tests to obtain valuable data.  See Kumho, 526 U.S. at 151-52 (allowing for consideration of "skill- or experience-based observation" under Daubert).  Plaintiffs also argue Stilson's testing complied with various industry testing standards, and that Toyota's own engine troubleshooting manual for the 1996 Camry recommend using a hairdryer to apply heat in an attempt to recreate problem conditions.  Gunn Decl. Exs. 6, 7.  Plaintiffs also note Toyota's expert and Toyota's corporate representative both conceded that vehicle temperatures could increase significantly during operation.  Id. Exs. 5, 10.  Finally, in response to the argument that Stilson moved the cruise control bracket for testing, Plaintiffs contend Stilson only moved the bracket so that he could test the throttle system alone; and moving the cruise control bracket for testing actually prevented it from potentially exacerbating the defect.

Stilson has offered sufficient foundation to allow the admission of his testimony regarding testing.  Although the Court is not entirely convinced that Stilson's testing is as precise or reliable as other testing methods might be, it is not for a trial court to bar expert testimony in

every instance when a better method might be available.  <u>Bonner</u>, 259 F.3d at 929 ("[E]ven if the judge believes there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are good grounds for the expert's conclusion, it should be admitted.") (citation omitted).  Plaintiffs have demonstrated that, to at least some degree, Stilson abided by standard testing requirements, and used a method previously suggested by Toyota itself.  And to the extent Stilson relied on faulty variables, including moving the cruise control bracket, Toyota may expose such weaknesses in cross-examination and through its own expert witness.  <u>See</u> <u>Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.</u>, 125 F.3d 1176, 1183 (8th Cir. 1997) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (citation omitted).

### b.  Other Incidents

In addition to his testing, Stilson relies on complaints of unintended acceleration in other 1996 Camrys to confirm his design defect opinion.  Stilson apparently obtained information about the similar complaints by searching online.  He neither printed nor saved the search results he reviewed, but nevertheless opines that these other incidents form part of the basis of his opinion.  Stilson Dep. 133-34.  Toyota argues this reliance does not bolster the reliability of Stilson's opinions.  Plaintiffs respond that Stilson not only relied on the complaints he found, but that the various previous incidents of unintended acceleration identified by Plaintiffs further support Stilson's conclusions.

Although the undocumented internet research Stilson conducted does not improve the reliability of his opinion, Plaintiffs have introduced sufficient evidence of other unintended acceleration incidents to bolster Stilson's design defect opinions.  As discussed above, Plaintiffs

have obtained specific testimony regarding several instances in which 1995 and 1996 Camry

owners experienced unintended acceleration, as well as eight administrative complaints.  In

addition, Plaintiffs identify several additional administrative complaints filed after the June 10,

2006, accident.  See Trice Compl. ¶ 72.  In strict liability cases, evidence of similar injuries or

incidents may help "prove a product's lack of safety or a party's notice of defects."  J.B. Hunt

Transport, Inc. v. Gen. Motors Corp., 243 F.3d 441, 445 (8th Cir. 2001).  At least some of the

evidence of other incidents offered by Plaintiffs appears to be similar enough to Lee's

unintended acceleration incident to have probative value.  As such, this evidence bolsters the

reliability of Stilson's testimony.

### c. Feasible Alternative Design

An important factor in determining whether a product was designed with reasonable care

is the "availability of a feasible, safer alternative design."  Young v. Pollock Eng'g Grp., Inc.,

428 F.3d 786, 789 (8th Cir. 2005).  In almost every design defect case, a plaintiff will

demonstrate a safer design as part of establishing liability.  Only in rare cases, such as when a

product cannot be made safe but should instead be removed from the market, will a plaintiff have

no need to proffer an alternate design.  Id.  In this case, Stilson contends that three safer designs

are possible: 1) using metal pulleys instead of plastic pulleys; 2) using separate cables for the

cruise control and throttle, instead of pulleys to relay one cable; and 3) moving the throttle pulley

assembly higher and further from heat sources inside the engine compartment.

Toyota argues Stilson failed to test any of his alternate designs, and that as a result these

opinions must be excluded.  Plaintiffs respond that Stilson does not need to test his proposed

designs, because they are theoretically sound but also because they have been put into practice in

potentially "millions" of existing vehicles.  Plaintiffs note that the 2000 model Camry uses

separate cables, as Stilson proposes, and that it also places the throttle pulley assembly further away from heat sources.  Stilson Dep. 54-56; 139-41.

Based on the record presented, a reasonable jury could conclude Stilson's offered designs are safer but still feasible.  When a safer design alternative has been implemented in other products, a jury may consider the other products in determining feasibility and safety.  See, e.g., Krumm v. Bar Maid Corp., No. 11-2782, 2013 WL 3064442, at *5 (D. Minn. June 18, 2013). Toyota is correct that Stilson relies on the 2000 model Camry, a car that did not exist in 1996, when discussing the feasibility of his alternate designs.  But, at a minimum, these alternate designs demonstrate feasibility in the abstract; nothing in the record indicates these mechanical alterations did not exist or would not have been feasible in 1996.  A reasonable jury could conclude, based on Stilson's testimony, that safer designs were available to Toyota in 1996.

## 2. Pedal Application Theory

Toyota contends that the accident was caused by Lee's inadvertent application of the gas pedal, rather than unintended acceleration caused by a design defect.  In anticipation of this trial defense, Stilson opines that the gas pedal application theory defies both engineering and "human factor" principles.  Stilson concludes that based on the manner in which drivers operate vehicles, Lee could not have mistaken the gas pedal for the brake during his entire drive near and along the off-ramp: a total distance Stilson estimates as 1600 feet.  Stilson Dep. 73-74.  Instead, Stilson opines that a normal driver in the same situation would have applied his brakes gradually, and Plaintiffs argue Stilson's opinion in this regard is consistent with Lee's testimony.  See Lee Dep. 98-99.  Stilson also concludes that Lee applied the brakes because the Camry was found to have deformed brake light filaments, indicia that the brakes were applied at the time of the accident. Stilson Dep. 112.

29

Toyota attempts to discredit the above evidence in two primary respects.  First, Toyota argues it is unknown how Stilson derived his 1600 foot estimate; Toyota's own expert concluded Lee had a much shorter time to apply the brakes.  This means, according to Toyota, it was more likely Lee accidentally pressed the gas pedal without having time to correct the Camry's speed.  Second, Toyota argues Stilson has no qualification to testify about "human factors," or the nature of interaction between people and designed products.  As a result, Stilson's testimony regarding how people normally behave, and how Lee behaved in this instance, has no reliable methodology.

Sufficient evidence exists on the record to support the reliability of Stilson's opinions.  Plaintiffs implicitly concede that Stilson may have misinterpreted the data when he began his analysis with 1600 feet as the total distance Lee had to apply the brakes.  See Pls.' Opp'n to Stilson Exclusion [Block Docket No. 144] at 43.  Using an incorrect distance estimate, while problematic, suggests Stilson should be exposed to vigorous cross-examination and not the wholesale exclusion of his testimony.  A jury may still find persuasive Stilson's underlying conclusion regarding Lee's behavior.  Further, Stilson's experience in designing and engineering cars, and his experience consulting on car design, appears to qualify him to testify regarding how drivers interact with their cars.  To the extent Stilson lacks appropriate qualifications or contradicts Toyota's expert witness, Toyota may explore those issues at trial.  Finally, the deformed brake light filament, though it does not indicate when the brakes were applied, could lead a reasonable jury to conclude Lee did not accidentally press the gas pedal for the entire length of the off-ramp.  As a result, its existence is further support of Stilson's opinion.

### 3. Brake Malfunction

In combination with his design defect theories regarding unintended acceleration, Stilson concludes that Lee's Camry experienced a brake malfunction. Thus, despite Lee's alleged attempt to apply the brakes after experiencing unintended acceleration, Lee could not stop his car. In his report, Stilson states that based on his experience, three possible conditions could have lead to a brake failure: brake bypass, brake "fade," and vacuum depletion. Stilson Report at 6. Brake bypass occurs when piston seals build up pressure and cause a bypass resulting in inadequate pressure to the brake calipers. Brake fade occurs when the brake caliper pads are overheated, thus reducing the pads' efficiency. And vacuum depletion occurs when a driver presses the brakes repeatedly, "depleting" the engine vacuum. Stilson Report at 6. In his initial report, Stilson stated he did not know which of the three conditions led to Lee's brake failure. Id. At his deposition, however, Stilson modified his opinion and stated he believed vacuum depletion, in connection with brake fade, may have caused the brake failure. Stilson also conceded that no design defect was identified in the brakes themselves. Stilson Dep. 117.

Toyota argues that Stilson's opinions regarding brake failure are speculative. Further, Toyota contends Stilson changed his opinion regarding the likely cause of brake failure without conducting any additional investigation, showing the unreliability of his position. Toyota also argues Stilson did not find any physical evidence supporting his brake failure theory, and that the other technicians and experts to investigate the Camry have not found any such evidence. See Borkon Decl. Supp. Stilson Exclusion Exs. 9-13.

Stilson's opinions regarding brake failure will not be excluded. As Stilson himself concedes, his opinion regarding brake failure involves some speculation. The Eighth Circuit has held that with regard to expert testimony, "[a] certain amount of speculation is necessary, an

even greater amount is permissible (and goes to the weight of the testimony), but too much is fatal to admission." Grp. Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 760 (8th Cir. 2003). In this case, Stilson's opinion is derived in part from his experience and the nature of the accident. At least some physical evidence, such as the brake light filaments, exist in support of the conclusion that Lee applied his brakes prior to the accident. In addition, as Stilson noted, the condition of the brakes after the accident hampered his analysis. Stilson Report at 6; Stilson Dep. 115-16. Stilson also did not have the opportunity to inspect the Camry until six years after the criminal investigation, meaning the brakes had been disassembled and manipulated numerous times. Stilson Dep. 113. And those other investigations conducted in connection with the criminal trial failed to consider possibilities such as a brake fade, meaning Stilson could not rely on the other investigations to rule out brake failure. Id. at 118-19. Based on these facts, Stilson's testimony, while speculative, is not fatally so.

## D. Strict Product Liability Claims

### 1. Design Defect

All Plaintiffs, including those bringing wrongful death claims, have alleged a design defect theory of liability against Toyota. To recover under a design defect claim, a plaintiff must show: "(1) the product was in a defective condition, unreasonably dangerous to the user, (2) the defect existed when the product left the manufacturer's control, and (3) causation." Westbrock v. Marshalltown Mfg. Co., 473 N.W.2d 352, 356 (Minn. Ct. App. 1991) (citing Bilotta v. Kelley Co. Inc., 346 N.W.2d 616, 624 (Minn. 1984)). To determine whether a product is "unreasonably dangerous," Minnesota courts use the "reasonable care balancing test." Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1009 (8th Cir. 1998) (citation omitted). "What constitutes 'reasonable care' will, of course, vary with the surrounding circumstances and will involve 'a balancing of

the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm.'" Id. (quoting Holm v. Sponco Mfg., 324 N.W.2d 207, 212 (Minn. 1982)).  And, "[w]hether a product is defective is generally a question of fact; only where reasonable minds cannot differ does the question become one of law."  Thompson v. Hirano, 456 F.3d 805, 809 (8th Cir. 2006).

As discussed above, the parties have largely combined their discussion of Stilson's opinions with their analysis of Plaintiffs' design defect claims.  Because the Court finds Stilson's opinions to be admissible, it correspondingly finds Plaintiffs have established genuine questions of fact with regard to their design defect claims.  Stilson's opinions provide sufficient support for Plaintiffs' claim that the Camry had an unreasonably dangerous defect, and that this defect may have caused the June 10, 2006, collision.

Plaintiffs have also submitted evidence of other drivers experiencing unintended acceleration in their 1995 and 1996 Camrys.  As discussed above, a trial court may admit evidence of "other incidents" when the evidence is probative of a defect's existence.  J.B. Hunt Transport, Inc., 243 F.3d at 444.  Because evidence of other incidents risks confusing the issues or causing undue prejudice, the offering party has the burden of demonstrating that the past incidents are substantially similar to the incident at issue.  Id. at 445.  Ultimately, the admission of such evidence is within the trial court's discretion.  Arabian Agric. Servs. Co. v. Chief Indus., Inc., 309 F.3d 479, 485 (8th Cir. 2002); Hammes v. Yamaha Motor Corp. U.S.A., Inc., No. 03-6456, 2006 WL 1195907, at *12 n.2 (D. Minn. May 4, 2006).

In this case, the Court will admit at trial at least some of Plaintiffs' submitted statements, testimony, and complaints by other Camry drivers.  Plaintiffs have cited several instances in which a driver experienced unintended acceleration while driving; the driver was operating a

33

1995 or 1996 Toyota Camry; and the unintended acceleration occurred several years after the

Camry was manufactured.  In several instances, drivers also struggled to slow the vehicle while

applying the brakes.  See, e.g., Reilly Decl. Exs. 40-45.  These facts are sufficiently similar to

Lee's case to have probative value.  As such, they further demonstrate a question of fact

concerning whether Lee's 1996 Camry possessed an unreasonably dangerous defect.

Based on Stilson's opinions, the circumstances surrounding the accident, and the

evidence of other unintended acceleration events, the Court finds reasonable minds could

disagree as to whether Lee's Camry had an unreasonably dangerous defect, and whether this

defect caused the accident in question.  As a result, Plaintiffs' design defect claims must be

resolved by a jury.

### 2.  Failure to Warn

Plaintiffs, including the wrongful death trustees, all allege failure to warn claims in

addition to their design defect claims.  Generally stated, a failure to warn claim has three

elements: "(1) whether there exists a duty to warn about the risk in question; (2) whether the

warning given was inadequate; and (3) whether the lack of a warning was a cause of plaintiff's

injuries."  Seefeld v. Crown, Cork & Seal Co., Inc., 779 F. Supp. 461, 464 (D. Minn. 1991).

Plaintiffs' failure to warn claims must fail because Plaintiffs have not demonstrated why

a duty to warn existed.  Whether a duty to warn exists is a question that must generally be

resolved by the court as a matter of law.  Germann v. F.L. Smithe Mach. Co., 395 N.W.2d 922,

924 (Minn. 1986).  In close cases, the question of whether an injury was foreseeable—and thus

gave rise to a duty to warn—should be submitted to the jury.  Domagala v. Rolland, 805 N.W.2d

14, 27 (Minn. 2011).  The duty to warn arises when a manufacturer knew or should have known

about an alleged defect or danger, and should have reasonably foreseen that the defect or danger

would cause injury.  <u>See</u> <u>Seefeld</u>, 779 F. Supp. at 464; <u>Harmon Contract Glazing, Inc. v. Libby-Owens-Ford Co.</u>, 493 N.W.2d 146, 151 (Minn. Ct. App. 1992).  The duty relates only to the time the manufacturer made and sold the product.  <u>See, e.g.</u>, <u>Ramstad v. Lear Siegler Diversified Holdings Corp.</u>, 836 F. Supp. 1511, 1516 (D. Minn. 1993).

Although Plaintiffs have demonstrated a question of fact with regard to Toyota's knowledge of the alleged defect, this knowledge did not arise until well after Toyota manufactured and sold the 1996 Camry.  Of all of the evidence Plaintiffs submitted regarding other incidents of unintended acceleration in 1996 Camrys, only one occurred at or near the time of manufacture and sale.  <u>See</u> Block Compl. ¶ 53(g) (NHTSA complaint from driver who experienced unintended acceleration in March 1996).  Beyond this single instance, Plaintiffs offer no evidence as to how Toyota knew or should have known, <u>at the time of manufacture and sale</u>, that a dangerous defect may have existed in the 1996 Camry.  On the contrary, Plaintiffs' own examples of unintended acceleration suggest the alleged defect did not manifest in 1996 Camrys until after several years of use.  Plaintiffs do not discuss or cite other evidence that might demonstrate Toyota specifically knew about the alleged defect in the 1996 Camry at the time it sold them.  Based on this record, the Court cannot find a reasonably foreseeable danger existed which gave rise to a duty to warn as "a matter of public policy," such that Toyota should have included a warning in every 1996 Camry owner's manual or by some other means.  <u>Germann</u>, 395 N.W.2d at 924.  Because Plaintiffs have not established a duty to warn as a matter of law, their claims for failure to warn are dismissed.

**E.  Negligence Claims**

Apart from their strict liability claims for design defect and failure to warn, Plaintiffs each allege claims for common law negligence.  Toyota correctly notes that in the product

liability context, strict liability and negligence theories merge into one unified theory, sharing the same elements and burden of proof.  See Bilotta, 346 N.W.2d at 622; Piotrowski v. Southworth Prods. Corp., 15 F.3d 748, 751 (8th Cir. 1994).  Plaintiffs make no response to this argument, nor do they address their negligence claims separately, and so it is presumed they agree.  Plaintiffs' negligence claims will thus be considered merged with their design defect and failure to warn claims.

**F.  Fraud/Misrepresentation**

Only Plaintiff-Intervenors Lee and his family have stated a claim for fraud and misrepresentation.  Lee Compl. ¶¶ 112-123.[9]  Plaintiff-Intervenors allege Toyota learned of the alleged "latent defect" in 1996 Camrys and developed a duty to disclose the defect due its superior knowledge.  Id.  Thus, Toyota committed fraud by omission when it failed to disclose the defect to 1996 Camry owners, and simultaneously made statements promoting the safety of Toyota vehicles.

Minnesota courts have held a party has a duty to disclose in three general scenarios: (1) one who speaks must say enough to prevent his words from misleading the other party; (2) one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party, (3) one who stands in a confidential or fiduciary relation to the other party must disclose material facts.  See Klein v. First Edina Nat'l Bank, 196 N.W.2d 619, 622 (Minn. 1972).  Also, where the fraud "consists primarily of omissions, the reliance requirement may be relaxed."  Nelsen v. Craig-Hallum, Inc., 659 F. Supp. 480, 483 (D. Minn. 1987) (quotation omitted).

---

[9]  Although Plaintiff Trice-Adams had originally alleged a claim for fraud, her operative complaint has since removed these allegations.  See Trice-Adams Compl.

36

As with Plaintiffs' fraudulent concealment defense, Lee's fraud claim fails.  Even if Lee

has established a question of fact as to whether Toyota had special knowledge of the alleged

1996 Camry defect, Lee has not demonstrated Toyota's intentional or reckless efforts to conceal,

omit, or misrepresent information.  In addition, Lee and Toyota were never parties to a shared

transaction or agreement, a general prerequisite for a fraudulent omission claim.  See, e.g.,

Taylor Inv. Corp. v. Weil, 169 F. Supp. 2d 1046, 1064 (D. Minn. 2001).  Finally, as with

fraudulent concealment, Lee has failed to plead his fraud claim with particularity, despite being

directed to do so by the Court.  Block, 795 F. Supp. 2d at 890-91.  As a result, Lee's fraud claim

is dismissed.[10]

## G.  Negligent Infliction of Emotional Distress

Plaintiff-Intervenors Lee, his wife Panghoua Moua, and his father Nhia Lee allege a

claim for negligent infliction of emotional distress.[11]  Minnesota courts have held that "a person

within the zone of danger of physical impact who reasonably fears for his or her own safety and

who consequently suffers severe emotional distress with resultant physical injury may recover"

for negligent infliction of emotional distress.  Stadler v. Cross, 295 N.W.2d 552, 553 (Minn.

1980).  Toyota offers no argument as to why this claim should be dismissed while Plaintiff-

---

[10]  Functionally, the substance of Lee's fraud claim appears to be alleging a post-sale duty
to warn.  See, e.g., McDaniel v. Bieffe USA, Inc., 35 F. Supp. 2d 735, 742 (D. Minn. 1999).  The
post-sale duty to warn arises only in special circumstances, which Lee does not allege or argue
exist here.  See id.

[11]  Lee's children withdrew their claims for negligent infliction of emotional distress.  See
Pls.' Mem. Opp'n J. Pleadings [Trice Docket No. 115] at 7.  Also, although Plaintiff Trice-
Adams' complaint alleges negligent infliction of emotional distress, neither Plaintiffs nor Toyota
offer any discussion regarding this claim.  Because Trice-Adams and her children were not
present at the accident, they cannot viably pursue this claim.

Intervenors offer testimony in support of their claim.  As a result, this claim shall proceed to trial.

**H.  Breach of Warranty Claims**

Although certain Plaintiffs had alleged breach of warranty claims, Plaintiffs have withdrawn these claims in their memorandum opposing summary judgment.  Pls.' Opp'n at 50-51.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants' Motions for Summary Judgment in actions Civil Nos. 10-2802, 10-2804, and 10-2805 [Civil No. 10-2802, Docket No. 135], [Civil No. 10-2804, Docket Nos. 273, 274, 275], and [Civil No. 10-2805, Docket No. 149] are **GRANTED** in part and **DENIED** in part, as stated herein.

2.  Defendants' Motion for Summary Judgment in Civil No. 10-2803 [Civil No. 10-2803, Docket No. 124] is **GRANTED**.

3.  All claims in the Trice-Adams Complaint [Civil No. 10-2803, Docket No. 165] are **DISMISSED WITH PREJUDICE**.

      4.      Defendants' Motion to Exclude the Expert Testimony of John Stilson [Civil No. 10-2802, Docket No. 130], [Civil No. 10-2803, Docket No. 119], [Civil No. 10-2804, Docket No. 268], and [Civil No. 10-2805, Docket No. 144] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY IN CIVIL NO. 10-2803.**

BY THE COURT:

        s/Ann D. Montgomery      
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 18, 2014.