**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

Jassmine D. Adams,

        Plaintiff,

    v.                            Civil Case No. 10-2802 ADM/JSM

Toyota Motor Corporation, et al.,

        Defendants.
_____

Bridgette Trice, as trustee for the heirs
and next of kin of Devyn Bolton, deceased,

        Plaintiffs,                     **MEMORANDUM**
                                         **OPINION & ORDER**

Koua Fong Lee, Panghoua Moua, Nhia Koua Lee,
Nong Lee, Jemee Lee, a minor child,
American Family Mutual Insurance Company, as
subrogee of Koua Fong Lee, State of Minnesota
Department of Human Services, UCare Minnesota,
and Medica Health Plans,

        Intervenors,

    v.                            Civil Case No. 10-2804 ADM/JSM

Toyota Motor Corporation, et al.,

        Defendants.
_____

Quincy Ray Adams,

        Plaintiff,

Medica Health Plans,

        Intervenor,

    v.                            Civil Case No. 10-2805 ADM/JSM

Toyota Motor Corporation, et al.,

        Defendants.

Anne Brockland, Esq., The Simon Law Firm, PC, St. Louis, MO, on behalf of Plaintiffs in Civil No. 10-2802.

Bill Markovits, Esq., and Eric Kmetz, Esq., Markovits, Stocke & DeMarco, LLC, Cincinnati, OH, on behalf of Plaintiffs in Civil Nos. 10-2804 and 10-2805.

Marion Reilly, Esq., Hilliard, Muñoz & Gonzales, LLP, Corpus Christi, TX, on behalf of Plaintiff-Intervenors Koua Fong Lee, Panghoua Moua, Nhia Koua Lee, Nong Lee, and Jemee Lee.

Kevin J. Kennedy, Esq., Borgelt, Powell, Peterson & Frauen, SC, Oakdale, MN, on behalf of Plaintiff-Second Intervenor American Family Mutual Insurance Company.

David W. Graves, Esq., Bard D. Borkon, Esq., and Theodore Dorenkamp, Esq., Bowman and Brooke LLP, Minneapolis, MN, on behalf of Defendants.

W. Paul Otten, Esq., Otten Law Offices, Burnsville, MN, on behalf of Intervenors State of Minnesota Department of Human Services, UCare Minnesota, and Medica Health Plans.

## I. INTRODUCTION

On April 22, 2015, the undersigned United States District Judge heard oral argument on post-trial motions filed in the three above-captioned actions which were consolidated for trial. See Block v. Toyota Motor Corp., No. 10-2802 (D. Minn.), Trice v. Toyota Motor Corp., No. 10-2804 (D. Minn.), and Adams v. Toyota Motor Corp., No. 10-2805 (D. Minn.); Order, Nov. 12, 2014 [Block Docket No. 463].[1]  Before the Court are Defendants Toyota Motor Corp., Toyota Motor North America, Inc., Calty Design Research, Inc., Toyota Motor Engineering and Manufacturing North America, Inc., Toyota Manufacturing, Kentucky, Inc., and Toyota Motor Sales, USA, Inc.'s (collectively "Toyota" or "Defendants") Renewed Motions for Judgment as a

---

[1]  Citations to the respective dockets of these actions will take the following form: [Block Docket No. 1], [Trice Docket No. 1], and [Adams Docket No. 1].

Matter of Law [Block Docket No. 345], [Trice Docket No. 569], [Adams Docket No. 361];

Motions for New Trial [Block Docket No. 357], [Trice Docket No. 589], [Adams Docket No.

373]; Motions for Determination of Collateral Source Set-Offs and Enforcement of Settlement

Releases [Block Docket No. 336], [Trice Docket No. 555], [Adams Docket No. 352]; Motions to

Amend Judgment [Block Docket No. 363], [Trice Docket No. 595], [Adams Docket No. 378];

and  Motions to Stay Execution on Judgment [Block Docket No. 360], [Trice Docket No. 591],

[Adams Docket No. 376].

    The Court also heard oral argument on Plaintiff Jassmine Adams' Motion to Amend

Judgment  [Block Docket No. 350]; Plaintiff-Second Intervenor American Family Mutual

Insurance Company's ("American Family") Amended Motion to Alter or Amend Judgment and

Motion for Relief from Judgment [Trice Docket No. 574]; Plaintiff-Intervenors Koua Fong Lee,

Panghoua Moua, Nhia Koua Lee, Nong Lee, and Jemee Lee's (collectively, "the Lees") Motion

to Amend Judgment [Trice Docket No. 577]; Plaintiff Bridgette Trice's Motion to Amend

Judgment [Trice Docket No. 581]; and Plaintiff Quincy Ray Adams' Motion to Amend

Judgment [Adams Docket No. 366].  Intervenors State of Minnesota Department of Human

Services, UCare Minnesota, and Medica Health Plans have intervened and joined the Motions to

Amend Judgment by Plaintiffs Bridgette Trice and Quincy Adams to the extent those Motions

seek to include stipulated medical expenses in the Judgment against Toyota.

    For the reasons set forth below, Toyota's  Renewed Motions for Judgment as a Matter of

Law and Motions for New Trial are denied, Toyota's Motions for Determination of Collateral

Source Set-Offs and Enforcement of Settlement Releases and Motions to Amend Judgment are

granted in part and denied in part, and Toyota's Motions to Stay Execution on Judgment are

granted.  Additionally, the Motions to Amend Judgment filed by Jassmine Adams, Bridgette

Trice, the Lees, Quincy Adams, and American Family are granted in part and denied in part.

## II.  BACKGROUND

### A.  The Crash

Nine years ago, on June 10, 2006, Koua Fong Lee ("Lee") was driving his 1996 Toyota

Camry eastbound on Interstate 94 in St. Paul, Minnesota.  With him in the car were his then-

pregnant wife Panghoua Moua, his daughter Jemee Lee, his brother Nong Lee, and his father

Nhia Koua Lee.  Reilly Decl. [Trice Docket No. 313] Ex. 7 65-66.  As Lee progressed up the

Snelling Avenue exit ramp from the interstate, he alleges pressing the brake pedal, only to find

the brakes unresponsive.  Id. at 71-72.

At the apex of the Snelling Avenue ramp, which merges with Concordia Avenue, an

Oldsmobile Ciera was idling at a red light controlling the intersection of Concordia and Snelling

Avenues.  Javis Trice-Adams was the driver of the Ciera.  With him were Quincy Ray Adams, an

adult, as well as Javis Adams, Jr., Jassmine Adams, and Devyn Bolton, all minors.  The

occupants of the Ciera were all members of the same extended family.  Pls.'s 2d Am. Compl.

[Block Docket No. 103] ("Block Compl.") ¶¶ 20-21.

Lee's Camry continued up the ramp and struck the Ciera at a high rate of speed.  The

Ciera sustained severe structural damage and the impact forced the car into oncoming traffic.

Block Compl. ¶¶ 23-27.  Javis Trice-Adams and his son, Javis Adams, Jr., died at the scene of

the collision.  Jassmine and Quincy Adams suffered serious injuries, but survived.  Bolton, six

years old at the time, was rendered a quadraplegic and subsequently died in October 2007.  All

of the occupants of the Camry survived the crash.

4

Lee was charged and eventually convicted of seven counts of vehicular homicide and injury, and one count of careless driving despite his testimony that the Camry's brakes had failed.  Block Compl. ¶ 34.  In October 2007, Lee was sentenced to eight years in prison.

In 2009 and 2010, Toyota issued recalls for vehicles with "unintended acceleration." Although these recalls did not include 1996 Camrys, the model year of Lee's Camry, the recalls renewed interest in Lee's defense that a vehicle defect caused the crash.  Lee petitioned for, and was ultimately granted, post-conviction relief.  The county attorney subsequently decided not to appeal or re-file criminal charges.  Lee was released from prison after over two years of incarceration.  Id. ¶ 52.

In June 2010, the surviving occupants of the Ciera and trustees for the next of kin of the deceased filed suit against Toyota.  On October 25, 2010, Lee and his family moved to intervene in the Trice action.  Mot. to Intervene [Trice Docket No. 51].  Toyota ultimately stipulated to the inclusion of the Lees and further stipulated that their insurance company, American Family Insurance Company ("American Family"), could also intervene in the Trice action as the Lees' subrogee.  Stipulation [Trice Docket No. 78].

The Plaintiffs and Lees filed a collection of claims against Toyota grounded in six different legal theories:  (1) design defect, (2) failure to warn, (3) negligence, (4) fraud/misrepresentation, (5) negligent infliction of emotional distress, and (6) breach of warranty.  After summary judgment motions were decided, only design defect and negligent infliction of emotional distress claims remained for trial.[2]

---

[2] Claims premised on a negligence theory were merged into the design defect claims. The remaining claims were dismissed.

5

**B.  The Trial**

The trial commenced on January 7, 2015 and the jury began deliberating on January 28, 2015.  Over the course of the trial, the jury heard testimony from 26 witnesses, viewed hundreds of photographs and other exhibits, and observed witnesses illustrate their testimony through the use of numerous models and other demonstrative exhibits.  In total, the jury was in session for nearly 75 hours of trial time.

Succinctly, Plaintiffs' theory of defect was that the accelerator control system was defective because it was assembled with heat sensitive components that, under certain conditions, will stick or bind, causing the throttle control system to remain stuck even after the driver releases their foot from the accelerator pedal.

**C.  Jury Verdict and Judgment**

On February 3, 2015, after deliberating five days, the jury reached a verdict finding: (1) Toyota's design of the 1996 Camry resulted in a defective product that was unreasonably dangerous to Plaintiffs and was a direct cause of Plaintiffs' injuries; (2) Koua Fong Lee was negligent in his operation of the 1996 Camry and Lee's negligence was a direct cause of Plaintiffs' injuries; and (3) Toyota was 60% at fault and Lee was 40% at fault for Plaintiffs' injuries.  See Verdict [Trice Docket No. 550].  The Jury awarded monetary damages to Plaintiffs as follows:

1.  Jassmine Adams
    (a)    Past damages for bodily harm              $ 2,000,000.00
            and emotional distress
    (b)    Future damages for bodily harm          $ 2,000,000.00
            and emotional distress

2.  Quincy Adams
    (a)    Past damages for bodily harm              $ 750,000.00

|  |  | and emotional distress |  |
| --- | --- | --- | --- |
|  | (b) | Future damages for bodily harm and emotional distress | $ 500,000.00 |

3. Koua Fong Lee

|  | (a) | Past damages for bodily harm and emotional distress | $ 500,000.00 |
| --- | --- | --- | --- |
|  | (b) | Future damages for bodily harm and emotional distress | $ 750,000.00 |

4. Panghoua Moua

|  | (a) | Past damages for bodily harm and emotional distress | $ 250,000.00 |
| --- | --- | --- | --- |
|  | (b) | Future damages for bodily harm and emotional distress | $ 500,000.00 |

5. Jemee Lee

|  | (a) | Past damages for bodily harm and emotional distress | $ 50,000.00 |
| --- | --- | --- | --- |
|  | (b) | Future damages for bodily harm and emotional distress | $ 100,000.00 |

6. Nhia Koua Lee

|  | (a) | Past damages for bodily harm and emotional distress | $ 5,000.00 |
| --- | --- | --- | --- |
|  | (b) | Future damages for bodily harm and emotional distress | $ 10,000.00 |

7. Nong Lee

|  | (a) | Past damages for bodily harm and emotional distress | $ 10,000.00 |
| --- | --- | --- | --- |
|  | (b) | Future damages for bodily harm and emotional distress | $ 15,000.00 |

8. Estate of Devyn Bolton

|  | (a) | Loss of counsel, guidance, aid, advice, comfort, assistance, companionship, and protection Devyn Bolton would have given to her next of kin, Bridgette Trice and Carolyn Trice, had she lived. | $ 4,000,000.00 |
| --- | --- | --- | --- |

Id. Judgment reflecting the jury's verdict was entered the following day. See Judgment [Trice Docket No. 551].

**D.  Stipulated Damages Not Included in Verdict**

The jury's verdict did not include damages to which the parties had stipulated prior to or during the trial.  Before the trial, the Lees' automobile insurer, American Family, entered into a Joint Damage Stipulation with Toyota on the amount American Family would be entitled to recover in the event Toyota was found liable at trial.  See Joint Damage Stipulation [Trice Docket No. 428].

During the trial, Toyota stipulated to medical and funeral expenses for Devyn Bolton in the amount of $1 million in past medical expenses that were paid by UCare Minnesota ("UCare") and the Minnesota Department of Human Services ("DHS") under Minnesota's Medicaid program, and $8,660 in funeral expenses that were paid in part by the Crime Victims Reparations Board.  Trial Tr. Vol. VI, at 1337.  Toyota also stipulated during the trial to past medical damages for Quincy Adams in the amount of $77,894.18, a portion of which had been paid by Medica Health Plans ("Medica") under Minnesota's Medicaid program.  Trial Tr. Vol. XIII at 2268-70; Trial Tr. Vol. II at 176.

At the suggestion of Toyota's counsel, Plaintiffs' counsel agreed to exclude the past medical damages and funeral expenses from the Verdict Form "with the understanding that [the parties had] stipulated to those amounts and that those would be assessed by the Court essentially post-judgment if Toyota were found liable."  Trial Tr. Vol. XIII at 2269:22-25. Therefore, by consent of the parties, these expenses did not appear as line items on the damages portion of the Verdict Form and were not submitted to the jury.  See Verdict (reflecting no line item for past medical or funeral expenses); Final Jury Instructions [Trice Docket No. 542] at Jury Instruction No. 26 (excluding past damages for health care expenses).

**E. Post-Trial Motions**

After Judgment was entered on February 4, 2015, the parties filed these post-trial Motions, each of which is addressed below.  Also following the entry of the Judgment, motions to intervene were filed by DHS, UCare, and Medica (collectively, the "Medicaid Providers") based on their asserted right to recover medical assistance benefits paid on behalf of Devyn Bolton and Quincy Adams.  See Motions to Intervene [Block Docket No. 386], [Trice Docket Nos. 635, 651], [Adams Docket Nos. 404, 418].  The Medicaid Providers argue they have the right to recover medical assistance expenditures paid on behalf of Devyn Bolton and Quincy Adams and request that those expenditures be added to the Judgment.[3]  The motions to intervene were not opposed by any party and were granted on April 30, 2015.  See Order, April 30, 2015 [Trice Docket No. 658].

**III.  DISCUSSION**

**A.  Jurisdiction**

As an initial matter, in the time since the post-trial Motions were argued, Toyota has raised a number of potential jurisdictional issues in letters filed with the Court [Trice Docket Nos. 659, 660], but has not filed a motion challenging jurisdiction.  The Plaintiffs and Intervenors have filed letters [Trice Docket Nos. 662, 663, 664, 665] in response to the jurisdictional issues raised by Toyota.  After reviewing the letters filed by the parties, the Court

---

[3] Beyond filing the Motions to Intervene, the Medicaid Providers have filed no claims for relief in these actions and have not requested to be added to the Judgment or have their particular rights adjudicated.  Rather, the Medicaid Providers merely state that they "join with Plaintiff Bridget Trice and Plaintiff Quincy Adams['] motion papers" to the extent those pleadings seek to have the stipulated medical expenses added to the Judgment.  Otten Aff. [Trice Docket No. 654] ¶ 9.

is uncertain whether Toyota's jurisdiction concerns remain.  If Toyota feels that serious

jurisdictional issues require adjudication, it shall file a motion challenging jurisdiction on or

before June 24, 2015.  The Court will withhold entry of Judgment on this Order until June 25,

2015, at which time Judgment will be entered if no motion is filed.

**B.  Renewed Motion for Judgment as a Matter of Law**

Toyota contends it is entitled to judgment as a matter of law pursuant to Rule 50(b)

because there was no legally sufficient evidence permitting the jury to find that Lee's Camry was

defective.  Toyota argues a number of legal inadequacies befall Plaintiffs' design defect claim.

Toyota further argues that certain evidence was inadmissible and should not have been presented

to the jury.  Finally, Toyota argues that the Plaintiffs failed to present the legally required

evidence to prove its negligent infliction of emotional distress claim.

**1.  Legal Standard**

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for

judgment as a matter of law.  Under Rule 50, the court may allow judgment on the verdict, order

a new trial, or direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b)(1–3). The

standard of review for granting a Rule 50(b) motion is whether sufficient evidence exists to

support the jury verdict.  A motion for judgment as a matter of law should only be granted when

"all the evidence points one way and is susceptible of no reasonable inferences sustaining the

position of the nonmoving party."  Washburn v. Kan. City Life Ins. Co., 831 F.2d 1404, 1407

(8th Cir. 1987) (citation omitted).  In deciding a motion for judgment as a matter of law, the

court must view the evidence in the light most favorable to the party who prevailed before the

jury, making all reasonable inferences in that party's favor.  Id. (citation omitted).  The court

should not substitute its own judgment for that of a reasoned trier of fact.  Ryther v. KARE 11, 864 F. Supp. 1510, 1519 (D. Minn. 1994) (citing Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 803 (8th Cir. 1994)).

To recover under a design defect claim, a plaintiff must show:  "(1) the product was in a defective condition, unreasonably dangerous to the user, (2) the defect existed when the product left the manufacturer's control, and (3) causation."  Westbrock v. Marshalltown Mfg. Co., 473 N.W.2d 352, 356 (Minn. Ct. App. 1991) (citing Bilotta v. Kelley Co. Inc., 346 N.W.2d 616, 624 (Minn. 1984)).

### 2. Proof of the Causation Element

Toyota argues that the evidence presented at trial was legally insufficient for the jury to conclude that Lee's Camry was defective.  Toyota alleges four deficiencies to support its argument.  First, Toyota argues that Plaintiffs did not introduce any evidence showing that the conditions needed for the defect to manifest were actually present on the day of the crash. Second, Toyota argues that the evidence demonstrated Plaintiffs' theory of defect only when the original equipment manufacturing ("OEM") position of the accelerator control system was artificially altered.[4]  Third, Toyota argues that the alleged defect could not explain the Toyota's increase in speed between exiting the highway and impacting the Ciera.  Finally, Toyota renews its earlier argument that John Stilson's ("Stilson") evidence was inadmissible under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and should not

---

[4] Original Equipment Manufacturing is a term used here to describe the "as is" or stock assembly of the vehicle's components.  OEM parts have not been manipulated or altered after the vehicle has left the manufacturer's control.  Non-OEM parts, on the other hand, have been artificially changed after the vehicle has left the manufacturer's control.

11

have been presented to the jury.

Stilson, Plaintiffs' mechanical engineering expert, provided a general background of the relevant mechanical automobile components to the jury.  He testified that the accelerator pedal is attached to a cable that runs to a pulley.  Trial Tr. Vol. V at 819:8-10; 821:14-17; 836:12-24. When the gas pedal is depressed, the cable pulls and rotates the accelerator pulley, which, when rotated, causes a second pulley, the throttle pulley, to rotate as well.  The throttle pulley is connected to the throttle cable, which runs to the throttle body and actuates the throttle valve, which controls the engine's air intake.  When the force on the accelerator pulley is released and the pressure on the accelerator pedal is diminished, a spring on the accelerator pulley then returns the pulleys to idle position.  Stilson testified that these parts are all enclosed under a plastic dust cover.

Stilson's conclusion was that "when that temperature elevates inside this cover to a certain temperature, these parts bind, and they will lock up, and they won't return to idle."  In other words:

> [i]t means that when the person has their foot on the accelerator pedal, moves these two pulleys to a certain position, and when they remove their foot, this system will stay stuck in that position, meaning that the vehicle now is now not in control by the driver.  The vehicle is being controlled because this is stuck and the person has taken their foot off of it, and it will continue to drive along at that speed, whatever it is.

Trial Tr. Vol. V at 841:6-13.  Stilson tested his theory and concluded that the throttle control mechanism will stick if it is subjected to temperatures above 160°F.

### a.  Reasonable jury could find that temperatures inside the dust cover could reach 160°F

Toyota argues that Plaintiffs failed to introduce evidence showing that Lee's Camry

could have experienced the requisite conditions to sustain their theory of alleged defect, because there was no evidence that the actual temperature inside the cruise control cover reached 160°F. Thus, argues Toyota, the causation evidence is insufficient as a matter of law.

In support of its position, Toyota relies on Fireman's Fund Ins. Co. v. Canon U.S.A., 394 F.3d 1054 (8th Cir 2005). However, Fireman's Fund stands for the proposition that an expert's theory of defect is legally insufficient if the expert does not advance any theory or experiment to show how the conditions required for the defect to manifest occur. There, the plaintiff's experts theorized that a copy machine's defective thermal fuse failed to prevent a fire that the experts determined was caused by the copier's upper fixing heater assembly. Id. at 1057. "However, the experts' experimental tests did not demonstrate that the heating element could generate an open flame before the thermal fuse opened, and the experts admitted that an open flame would have been necessary to start the fire." Id. at 1061. While the experts admitted that a malfunction of the heater control circuitry was required to generate sufficient electrical current to start a fire, however, "the experts advanced no theory or experiment showing how the heater control circuitry could malfunction to produce such a current." Id.; see also Pro Serv. Auto., LLC v. Lenan Corp. 469 F.3d 1210, 1215–1216 (8th Cir. 2006) (affirming district court's exclusion of expert causation testimony because the expert "provided no testing or other engineering analysis to support his causation opinion[,]" instead "offer[ing] only vague theorizing based upon general principles."); Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1107–08 (8th Cir. 1996) (excluding expert opinion because it was not based on any knowledge about the amount of toxin needed to cause the claimed injury).

Unlike Pro. Serv. Auto. and Wright, Stilson did not simply conclude that the accelerator

13

control system was defective because it would stick when subjected to high temperatures.  To the contrary, here, Stilson performed a series of tests that showed the defect would manifest.  Stilson produced evidence and advanced a theory from which a reasonable juror could conclude the accelerator control system could be subjected to temperatures of 160°F and above.  Stilson testified that the exhaust manifold, which was located less than eight inches away from the throttle control system, reached temperatures near 1000°F.  His assertion was corroborated by Toyota's lead engineer, Yoshihiro Fujikawa, who stated the "exhaust manifold temperature was extremely high."  Trial Tr. Vol. VIII at 1219:1-4.  Stilson also testified that at least some heat from the manifold would be transferred into the area housing the critical engine components.  These engine components were housed under a plastic dust cover that acted like "a sauna," effectively trapping heat and limiting infiltration of cooler air to reduce the temperature.  Trial Tr. Vol. VI at 871:4.  The jury could thus have reasonably inferred that the temperature under the cruise control cover could reach 160°F.

### b.  Reasonable jury could find that the defect could occur with OEM components

Toyota next argues that it are entitled to judgment as a matter of law because Stilson's testing only exhibited his theory of defect when certain parts of the engine were artificially removed.  Plaintiffs argue that removing certain parts does not undermine the results of the testing because Stilson concluded that their removal did not impact the results of the testing.

Stilson conducted five tests to formulate his opinion of product defect.  In four of the tests, Stilson mechanically altered the cruise control mechanism by moving a cruise control bracket out of its OEM position.  In the fifth test, all parts were in their OEM positions.  When the bracket was removed, the throttle became stuck upon the application of heat.  When the

14

bracket was in its OEM position, the throttle did not stick.  Stilson explained his testing, and the results, to the jury.  When questioned about his conclusions and the fifth test that did not exhibit his theory of defect, Stilson stated, "[m]oving that lever of the cruise control system, which has nothing to do with the throttle operation, did nothing, changed nothing in terms of what [he] was evaluating."  Trial Tr. Vol. VI at 897:22–25.

Contrary to Toyota's assertion, Stilson did present experiments that advanced his theory of defect—the four tests that exhibited the defect.  See Fireman's Fund, 394 F.3d 1061. Although the test with OEM-positioned parts did not exhibit the defect, Stilson testified this was immaterial to his conclusions.  Toyota was given the opportunity to cross-examine and provide rebuttal testimony to discredit Stilson's conclusions.  The jury was entitled to accept or reject Stilson's testimony and the conclusions he offered.  Given the verdict, the jury presumably resolved this evidence in favor of Plaintiffs and determined Stilson to be credible.  These determinations of the jury will not be disturbed.  See Walsh v. Nat'l Computer Sys., Inc., 332 F.3d 1150, 1158 (8th Cir. 2003) (noting the standard of review for judgment as a matter of law claims).

### c.  Theory of defect is consistent with acceleration testimony

Toyota argues that Plaintiffs' stuck throttle theory cannot explain how Lee's Camry accelerated from highway speeds of 55-60 miles per hour to the approximately 75 miles per hour speed at impact that the parties' accident reconstruction experts calculated.  According to Toyota, a stuck throttle cannot cause the speed increase Lee's Toyota experienced as it traveled up the Snelling Avenue exit ramp.  Plaintiffs argue that they presented evidence explaining that once a throttle is stuck, it may stick at a higher speed if the accelerator pedal is further depressed.

15

Plaintiffs presented sufficient evidence entitling the jury to conclude that the stuck throttle caused the Lee Camry to accelerate to impact speed.  The jury heard testimony from Dr. Patrick Powers, a lay witness who testified about an event that occurred in his 1996 Camry, that when he tapped his accelerator pedal, the vehicle accelerated and remained at that higher speed. The jury also heard testimony from Stilson, who explained that once the defect manifests itself and the throttle sticks, it will stick at a higher rate of speed if the accelerator pedal is depressed.[5] Finally, the jury heard testimony that Lee's foot was "on the gas pedal" as his Camry exited the interstate.  Trial Tr. Vol. II at 273:2; Trial Tr. Vol. III at 498:17-20; 499:2-4.  While Toyota claims this statement does not mean Lee was actually <u>depressing</u> the accelerator pedal, the jury could have concluded otherwise.  As stated in <u>Hathaway v. Runyon</u>:

> The law places a high standard on overturning a jury verdict. Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party.  On such motion the court must assume as proven all facts that the nonmoving party's evidence tended to show, give her the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in her favor.

---

[5] Toyota asserts that Stilson's testimony does not claim that the throttle can stick at a higher speed if the accelerator pedal is depressed.  Toyota argues that Stilson's testimony that pressing the accelerator will only increase the sticking or binding of the pulleys and the speed that the vehicle is traveling will not change.  Plaintiffs argue that Toyota misinterprets the testimony.  According to Plaintiffs, Stilson actually testified if the throttle is stuck, additional pedal application will cause the sticking to occur when the pedal is depressed, increasing the speed the vehicle is traveling.  Plaintiffs' interpretation has support in the record.  In response to the question, "if stuck at that speed and then the accelerator pedal is pushed additionally, what happens?" Stilson responded that binding will increase "and if you push down [on the pedal], it will stay there."  Trial Tr. Vol. V at 841:15-17:21-22.  Stilson was manipulating a demonstrative accelerator pedal and throttle control system exhibit when this colloquy occurred.  His use of the word "there" is in reference to the new position on the demonstrative exhibit. The "there" referred to was a new position, not the position that the throttle was originally stuck at.

16

132 F.3d 1214, 1220 (8th Cir. 1997) (citations omitted).  There is not a complete absence of

probative facts supporting Plaintiffs' conclusion.  Judgment as a matter of law must be denied.

### d.  Admission of Stilson's Testimony

Toyota's final causation argument challenges the inclusion of Stilson's testimony.

According to Toyota, Stilson's testimony failed to meet the admissibility requirements of Rule

702 and Daubert.  Toyota challenges the conditions of Stilson's tests and the conclusions he

reached as a result of his testing.  Toyota also argues that Stilson's conclusions cannot be

reconciled with Plaintiffs' fact witnesses, and his opinion testimony regarding two other similar

incidents lacked the required foundation for admission.  Plaintiffs respond that Stilson's

testimony was properly admitted.  Plaintiffs argue that Stilson's tests were conducted according

to Toyota's own recommendations and his conclusions align with the facts elucidated during

trial.  Plaintiffs also argue that Stilson's testimony regarding the other incidents was proper.

Prior to trial, Toyota moved to exclude Stilson's testimony.  See Mot. [Block Docket No.

130].  Toyota advanced similar arguments at that time why Stilson's opinions were legally

deficient.  The Court denied Toyota's motion prior to trial.  Block v. Toyota Motor Corp., 5 F.

Supp. 3d 1047 (D. Minn. 2014).  For the reasons stated before and for the additional reasons

stated below, Stilson's evidence was properly admitted.

"It is settled law that evidence of experimental tests is inadmissible absent a foundational

showing that the tests were conducted under conditions substantially similar to those

surrounding the incident at issue."  Cowens v. Siemens-Elema AB, 837 F.2d 817, 820 (8th Cir.

1988).

As previously discussed, Stilson performed five tests to "evaluate the performance" of

the accelerator assembly if there was "thermal input into the system." Trial Tr. Vol. V at 849:1-3. Stilson testified that his tests revealed that between 160°F to 165°F, he found a "[s]tuck throttle." Trial Tr. Vol. VI at 910:23-25; 911:18-19. Stilson's tests were substantially similar and his conclusions were properly admitted for presentation to the jury. As stated previously, "Stilson abided by standard testing requirements, and used a method previously suggested by Toyota itself." Block, 5 F. Supp. 3d at 1066.

Toyota also contends that the results of Stilson's fifth test, where he used OEM-positioned parts and no sticking occurred, does not support his conclusions that sticking can occur in an OEM throttle control assembly. Toyota's expert offered a competing view, testifying that the modification added "additional frictional forces into the system that normally would not be there." Trial Tr. Vol. XII at 1920:15-16. While evidence may be excluded if the court determines "that there is simply too great an analytical gap between the data and the opinion proffered," General Elec. Co. v. Joiner, 522 U.S. 136 (1997), district courts are instructed "not to weigh or assess the correctness of competing expert opinions." Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 562 (8th Cir. 2014) (citing Kuhn v. Wyeth, Inc., 686 F.3d 618, 625 (8th Cir. 2012)). It was the proper province of the jury to resolve these competing expert opinions. The analytical gap between Stilson's opinion and the fifth test is not wide enough to vacate the decision of the jury.

Finally, Toyota renews its argument that the other incident testimony of Patrick Powers and Michael Frazier that Stilson relied on was not substantially similar to the Lee Camry crash and that testimony should thus be excluded. As the Court has concluded throughout this litigation and as will be discussed in greater detail below, the Powers and Frazier incidents bore

18

a substantial similarity to what happened here.

### 3. Defect Existed When it Left Toyota's Control

Plaintiffs also have to prove that the Camry was defective when it left Toyota's control. Westbrock, 473 N.W.2d at 356. Toyota argues that the Plaintiffs failed to carry this burden. In support, Toyota again argues that Stilson's manipulation of the cruise control lever is grounds for overturning the jury's verdict. Toyota also argues that the hole Stilson cut in the dust cover created a dangerous condition that would not occur in actual use. These arguments are unavailing. There was a legally sufficient basis for the jury to conclude that the dangerous condition would occur if the vehicle was in its OEM position. Stilson also provided a legally sufficient basis for the jury to conclude that heat could get under the dust cover to raise the temperature to the critical level.

### 4. Feasible Alternative Design Evidence Proper

Toyota also argues that the Plaintiffs were unable to provide sufficient evidence of a feasible alternative design. Despite supplying the jury with what Stilson concluded was a feasible alternative design, Toyota argues that his testimony is inadmissible because there is no evidence that Stilson's proposed changes would work without interfering with the existing cruise control system and other aspects of the Camry.

An important factor in determining whether a product was designed with reasonable care is the "availability of a feasible, safer alternative design." Young v. Pollock Eng'g Grp., Inc., 428 F.3d 786, 789 (8th Cir. 2005). Stilson testified that his proposed design—using a direct cable from the throttle to the cruise control—was feasible in 1996, the model year of Lee's Camry. Trial Tr. Vol. V at 845:7-9. Stilson also testified that his alternative design would "have

no effect on the system as designed by Toyota." Trial Tr. Vol. VI at 919:16-21. Toyota cites no

trial testimony supporting Toyota's conclusion that Stilson's alternative design would not have

properly functioned in the Camry's design. While Toyota attempted to discredit Stilson's

alternative design by arguing that Stilson lacked the requisite experience to design such a

system, Stilson worked as a mechanical engineer and car designer for Ford Motor Co., Chrysler

Corp., and other companies. See Gunn Decl. [Block Docket No. 145] Ex. 4. Stilson's

alternative design evidence was properly submitted to the jury.

### 5. Other-Incident Testimony Substantially Similar

Toyota renews its argument that the testimony of other 1996 Camry owners Michael

Frazier, Ronald Neumeister, and Patrick Powers, variously referred throughout the trial as "other

similar incident" or "other incident" testimony, should not have been admitted. Toyota argues

that the experiences of these witnesses were not substantially similar to the Lee incident.

Plaintiffs argue that the incidents meet the threshold requirement of similarity, and any

distinctions between the other incidents and the Lee Camry go to their weight, not admissibility.

"A party may offer evidence of prior accidents to show notice, causation, feasibility of

correction, or magnitude of danger if a showing of substantial similarity is made." Ahlberg v.

Chrysler Corp., 481 F.3d 630, 637 (8th Cir. 2007) (citing Drabik v. Stanley-Bostitch, Inc., 997

F.2d 496, 508 (8th Cir. 1993) (emphasis in original)). For this other incident evidence to be

admissible, "the proponent of the evidence must show that the facts and circumstances of the

other incident are substantially similar to the case at bar." Drabik, 997 F.2d at 508 (citing Lewy

v. Remington Arms Co., Inc., 836 F.2d 1104, 1108 (8th Cir. 1988)). An incident may be

considered substantially similar upon a showing that the event is "sufficiently similar in time,

place or circumstances." First Sec. Bank v. Union Pac. R.R. Co., 152 F.3d 877, 879 (8th Cir.

1998) (quoting Thomas v. Chrysler Corp., 717 F.2d 1223, 1225 (8th Cir. 1983)).

Before trial, Plaintiffs sought to introduce 14 "other incident" witnesses during trial.

Toyota moved in limine to bar their testimony.  Motion in Limine [Trice Docket No. 385].

Plaintiffs were ultimately permitted to present the testimony of three such witnesses, Michael

Frazier, Ronald Neumeister, and Patrick Powers.  Each drove a 1996 Camry with high mileage.

Frazier testified that his vehicle accelerated without any pressure on the gas pedal and he needed

to use both feet on the brake pedal to control his vehicle.  Neumeister testified that his Camry

continued to accelerate after he reached his intended highway speed.  Powers testified that in his

incident, applying the brakes was "almost useless."  Trial Tr. Vol. III at 475:20-24.  Toyota

remains steadfast in its belief that the jury should not have heard testimony from these three

witnesses.

"Evidence of prior accidents is admissible only if the proponent of the evidence shows

that the accidents occurred under circumstances substantially similar to those at issue in the case

at bar." Hale v. Firestone Tire & Rubber Co. 756 F.2d 1322, 1332 (8th Cir. 1985) (citing

Peterson v. Auto Wash Mfg. & Supply Co., 676 F.2d 949, 953 (8th Cir. 1982)).

Here, the three witnesses' events occurred in 1996 Camrys with high mileage.  Each

experienced an acceleration event after years of incident free operation.  All three testified that

their vehicle powerfully accelerated and that their use of the brakes failed to normally slow the

vehicle down.  Further, although Toyota argued that the Neumeister and Powers incidents likely

resulted from a dirty throttle body, Powers testified experiencing another acceleration event after

his vehicle's throttle body was cleaned, and the cause of the Frazier event was not conclusively

determined.

Contrary to Toyota's assertion, the other incidents need not be identical to that experienced by Lee; the threshold is one of substantial similarity, not uniformity.  The events experienced by Frazier, Neumeister, and Powers were sufficiently similar in circumstance to what Lee experienced and were properly admitted.

### 6.  Medical Evidence for Emotional Distress Claim

Finally, Toyota challenges the jury's award of emotional distress damages to Panghoua Moua and Nhia Koua Lee.  Toyota's challenge rests on two independent grounds.

#### a.  Expert Testimony Not Required

Toyota renews its argument that Panghoua Moua and Nhia Koua Lee were required to present expert medical testimony to establish the causal connection between the crash and their alleged emotional distress.  Plaintiffs argue that, although expert testimony is required to prove intentional infliction of emotional distress, it is not required to prove negligent infliction of emotional distress.  Toyota raised this argument during the trial pursuant to Fed. R. Civ. P. 50(a). [Trice Docket No. 529].  The Court rejected Toyota's argument then and rejects it again now.

Negligent infliction of emotional distress and intentional infliction of emotional distress are two independent causes of action.  See Leiendecker v. Asian Women United of Minn., 848 N.W.2d 224, 227 n.1 (Minn. 2014) (noting that both negligent and intentional infliction of emotional distress claims are in the complaint); Iacona v. Schrupp, 521 N.W.2d 70, 73 (Minn. Ct. App. 1994) ("Intentional infliction of emotional distress is a separate and independent tort."). Panghoua Moua and Nhia Koua Lee sued Toyota under a negligent infliction of emotional distress theory.  To sustain such a claim, a plaintiff must be "within a zone of danger of physical

impact, reasonably fears for his or her own safety, and consequently suffers severe emotional distress with resultant physical injury." Yath v. Fairview Clinics, N.P., 767 N.W.2d 34, 46 (Minn. Ct. App. 2009) (quoting Bohdan v. Alltool Mfg., Co., 411 N.W.2d 902, 907 (Minn. Ct. App. 1987)).

Under Minnesota law, expert medical testimony is not required to prove negligent infliction of emotional distress cases because "the zone of danger rule provides an indicia of genuineness the intentional tort requirements lack." Quill v. Trans World Airlines, 361 N.W.2d 438, 443 (Minn. Ct. App. 1985). Courts have long recognized the difficulty in assessing the genuineness of emotional distress cases. Hubbard v. United Press Intern., Inc., 330 N.W.2d 428, 439 (Minn. 1983) (citing Restatement (Second) of Torts § 46 (1965)); Deli v. Univ. of Minn., 578 N.W.2d 779, 783-84 (Minn. Ct. App. 1998). Courts have also long recognized that the fear of fictitious claims is eliminated when plaintiffs are clearly in a zone of danger. Purcell v. St. Paul City Ry. Co., 50 N.W. 1034, 1035 (Minn. 1892); K.A.C. v. Benson, 527 N.W.2d 553, 557-58 (Minn. 1995). There is no doubt that Panghoua Moua and Nhia Koua Lee, as passengers in a car approaching a congested intersection at highway speed with the driver claiming the brakes were "not working," were within the zone of danger. They were not required to present medical evidence of physical manifestation of their emotional distress.

### b.  Other Sources of Emotional Distress

Toyota additionally argues the testimony of Panghoua Moua and Nhia Koua Lee was legally insufficient to establish the causal connection between the crash and the emotional distress because other events likely contributed to their emotional distress.

Toyota argues that other events in their lives, including Panghoua Moua's husband's

imprisonment and her daughter's ovarian cancer diagnosis, as well as Nhia Koua Lee's prior depression blur the causal correlation between the crash and their emotional distress.  Toyota relies on <u>Patterson v. Wu Family Corp.</u> for its contention that expert medical testimony is needed to "establish causation when the question involves medical factors beyond the knowledge of the average layperson."  594 N.W.2d 540, 550 (Minn. Ct. App. 1999), <u>rev'd on other grounds</u>, 608 N.W.2d 863 (Minn. 2000).

Expert medical testimony is not needed here because it is common sense that the question of whether a life-altering high speed fatal crash may cause emotional distress is not a factor beyond the knowledge of the average layperson.  Thus Panghoua Moua and Nhia Koua Lee were not required to present expert medical testimony to establish the causation requirement of their claims for negligent infliction of emotional distress.

## C.  New Trial

Toyota alternatively requests a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.  In support, Toyota raises the following four points independent of its motion for judgment as a matter of law:  1) the verdict is against the greater weight of the evidence on the issues of defect and causation; 2) the testimony of Stilson, Frazier, Neumeister, and Powers should not have been admitted; 3) the damage awards to Jassmine Adams and Jemee Lee are excessive and against the greater weight of the evidence; and 4) Plaintiffs' closing argument was improper and unfairly prejudicial.

### 1.  Legal Standard

Federal Rule of Civil Procedure 59(a)(1) provides that the Court "may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:  (A) after a

jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court. . . .  Fed. R. Civ. P. 59(a)(1).  In evaluating a motion for a new trial, the "key question" is whether retrial is needed "to avoid a miscarriage of justice," McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994), either because of legal errors made during the trial or because the verdict is against the weight of the evidence.  White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992).  "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court."  Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980).  But in exercising that discretion, "a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."  King v. Davis, 980 F.2d 1236, 1237 (8th Cir. 1992) (citing White, 961 F.2d at 780).  "Instead, a district judge must carefully weigh and balance the evidence and articulate reasons supporting the judge's view that a miscarriage of justice has occurred."  Id.

## 2.  Defect and Causation

Toyota argues that the evidence presented at trial on the issues of defect and causation are against the greater weight of the evidence.  Toyota argues that since the evidence is extremely weak as to whether the Camry was defective, whether the defect existed when it left Toyota's control, and whether the defect caused the injuries, a new trial is warranted.

To be entitled to a new trial on the basis that the verdict is against the greater weight of the evidence, district courts may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."  White, 961 F.2d at 780.  "[T]he true standard for granting a new trial on the basis of the weight of the evidence is simply one

which measures the result in terms of whether a miscarriage of justice has occurred.  When

through judicial balancing the trial court determines that the first trial has resulted in a

miscarriage of justice, the court may order a new trial, otherwise not."  Id. (citation omitted).

Stilson's theory that the accelerator pulleys were defective was subject to a rigorous cross

examination and was further attacked by Toyota's experts' conclusions that Lee misapplied the

accelerator and brake pedals as the Camry traveled up the Snelling Avenue exit ramp.  Plaintiffs'

theory that the broken brake light filament corroborates Lee's testimony and his sincere belief

that he was applying the brakes was challenged by Toyota's experts' theory that inertia and crash

forces completed the brake circuit and broke the filament in a time span measured in

milliseconds.  The jury deliberated for five days before reaching its unanimous verdict.  The

Court is convinced the jury discharged their duties diligently and with care.  The verdict did not

result in a miscarriage of justice warranting a new trial.

### 3.  Admission of Evidence

Toyota repeats its contention that evidence was admitted contrary to law and its

admission influenced the jury's verdict.  Toyota argues that the testimony of Stilson, Frazier,

Neumeister, and Powers was erroneously admitted.  This argument is denied.  Toyota made

similar arguments in its Renewed Motion for Judgment as a Matter of Law.  The legal

justification previously articulated regarding the admissibility of this testimony will not be

repeated here.

### 4.  Damage Award Against Greater Weight of the Evidence

Toyota argues that a remittitur should be granted to the damage awards of Jassmine

Adams and Jemee Lee because they are excessive and against the greater weight of the evidence.

Remittitur "is a procedural matter governed by federal, rather than state law." Taylor v. Otter

Tail Corp., 484 F.3d 1016, 1019 (8th Cir. 2007) (quoting Parsons v. First Investors Corp., 122

F.3d 525, 528 (8th Cir. 1997)).  But, in weighing the excessiveness of a verdict, it is state law

which governs.  Peoples Bank and Trust Co. of Mountain Home v. Globe Int'l Publ'g, Inc., 978

F.2d 1065, 1070 (8th Cir. 1992).

"A district court should grant remittitur only when the verdict is so grossly excessive as

to shock the court's conscience." Am. Bus. Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1146

(8th Cir. 1986) (citing Ouachita Nat'l Bank v. Tosco Corp., 716 F.2d 485, 488 (8th Cir. 1983)

(en banc)).  A verdict is not considered excessive unless there is "plain injustice" or a

"monstrous" or "shocking" result.  Jenkins v. McLean Hotels, Inc., 859 F.2d 598, 600 (8th Cir.

1988).  Whether a verdict is sufficiently outrageous to warrant remittitur is vested in the

discretion of the district court.  Benny M. Estes & Assocs., Inc. v. Time Ins. Co., 980 F.2d 1228,

1235 (8th Cir. 1992).

### a. Jassmine Adams

The jury awarded Jassmine Adams $2 million in past and $2 million in future "damages

for bodily harm and emotional distress."  Verdict 3.  Toyota argues that these awards are

unjustifiably inflated given the injuries Jassmine Adams sustained from the crash.  Toyota argues

that her award should not exceed $1 million.

The $2 million jury award for past damages will not be disturbed.  There can be no doubt

this is, and will likely forever be, the most horrific, tragic, and distressing event in Jassmine

Adams' life.  The crash occurred at a fragile time in her young life, as a 12-year old girl

navigating the tribulations of adolescence.  Losing family members in such a manner is

incomprehensible and was undoubtedly a life-altering event for Jassmine Adams.  The crash forces crumpled the Ciera, trapping Jassmine Adams inside with her dead and dying family members.  Jassmine Adams testified that she saw her grandfather, Quincy Adams, seizing in the front seat.  She saw her cousin, Devyn Bolton, slumped over and bleeding from the head; Jassmine Adams believed Devyn Bolton was dead.  Jassmine Adams testified the she saw her father in the front seat, facing the door.  She told her family to "get up," but they did not respond.  Trial Tr. Vol. II at 222:15–16.  Finally, the Ciera had to be cut apart so Jassmine Adams could be lifted out and brought to the hospital.

The cases Toyota cites to justify a reduction fail to appreciate that this award is more than merely compensation for Jassmine Adams' physical injuries, which were unequivocally severe.  She fractured her left femoral head, requiring a plate screwed into her bone.  Dr. Scott Marston, the orthopedic surgeon who treated Jassmine Adams, classified her fracture as a Delbet I-B.  Dr. Marston testified this was the worst kind of fracture of this nature.  See Trial Tr. III at 412:3-11.  The crash also broke the growth plate in Jassmine Adams' leg.  Dr. Marston testified that this injury means "she will not have any growth from this growth plate and that will affect the length of the leg." Id. 420:23–25.  Jassmine Adams is still receiving physical therapy.  Simply put, the jury's past damage award is not "monstrous" or "shocking" to justify remittitur.

The $2 million future damages award will also not be disturbed.  First, the jury reasonably credited Jassmine Adams' doctor's opinion that she will most likely require additional medical procedures as she ages.  Second, since the Verdict Form did not differentiate, one can only speculate how the jury apportioned their award between bodily harm and emotional

distress.[6]  Jassmine Adams' life expectancy, which was provided to the jury, determined she

likely has many years of her life ahead of her.  Her future joys and struggles will be celebrated

and counseled without the aid and benefit of family members who died in the crash.  Jassmine

Adams' future damages award is not "monstrous" or "shocking" and will not be modified.

### b.  Jemee Lee

The jury awarded Jemee Lee $50,000 in past and $100,000 for future "damages for

bodily harm and emotional distress."  Verdict 3.  Toyota argues that these amounts are

unreasonable and not supported by the evidence.

At the time of the crash, Jemee Lee was two or three years old.  She received a bruise on

her stomach and was taken to the hospital for a brief time to ensure she did not suffer any

internal trauma.  She testified that she has no enduring injuries or lingering pain or aches as a

result of the crash.  In regard to her emotional distress, Jemee Lee testified that due to her age at

the time of the crash, she does not remember most of what happened.  When asked about what

she does remember, she testified that "we went to a church and then we were in a car and then I

was at the hospital."  Trial Tr. Vol. VIII at 1252:12-15.  Jemee Lee testified only that her parents

rarely talk about the crash in front of her or her siblings, and when they do talk about the crash

she experiences "[a] little sadness."  Id. 1253:2-7.

The evidence does not support the jury's award for past and future damages.  Based on

the absence of evidence of any physical injury and her inability to remember the events due to

her young age, the damage award is grossly excessive and will therefore be reduced to zero.

---

[6] The parties did not object to the design of the Verdict Form.

## 5.  Closing Argument

Toyota argues that Plaintiffs' counsels' closing arguments were improper and warrant a new trial.  Toyota contends that evidence was prejudicially mischaracterized, a new theory of liability was presented that Toyota could not respond to, and improper "send a message" styled arguments were made.  Toyota further argues that the cumulative effect of the harmless errors meld together to create a single reversible error.

"A new trial should be granted where the improper conduct of counsel in closing argument 'causes prejudice to the opposing party and unfairly influences a jury's verdict.'" Alholm v. Am. S.S. Co., 144 F.3d 1172, 1181 (8th Cir. 1998) (quoting Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 540 (2d Cir. 1992)).  "[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence."  Gilster v. Primebank, 747 F.3d 1007, 1011 (8th Cir. 2014) (alterations in original) (quoting Whittenburg v. Werner Enters. Inc., 561 F.3d 1122, 1128-29 (10th Cir. 2009)). The entire trial is the context for determining whether Toyota has made the requisite showing of prejudice.  Gilster, 747 F.3d at 1011.

### a.  Alleged Mischaracterization of Evidence

Toyota argues that Plaintiffs' counsel, Robert Hilliard, unfairly mischaracterized liability evidence during his closing argument to the jury.  The alleged mischaracterizations can be grouped into three categories.

### i.  Stopschinski

Toyota first argues that Hilliard misrepresented the testimony of Karl Stopschinski, Toyota's accident reconstructionist and vehicle performance expert.  Toyota takes umbrage with

Hilliard's reference to Plaintiffs' Exhibit 287, a crude depiction of an admittedly imprecise estimation of various accelerator pedal positions created by Stopschinski during his testimony using a demonstrative model, a piece of foam board, and a permanent marker. Toyota additionally argues that Plaintiffs' brief display of a computer animation not admitted as evidence exacerbates the mischaracterization.

Plaintiffs' Exhibit 287 was created in the presence of the jury to display Stopschinski's estimation of various accelerator positions. Shortly after it was created, during a brief recess, Toyota created their own exhibit, Defense Exhibit 1281, that was a more accurate depiction of the pedal positions. During this portion of Plaintiffs' closing argument, Toyota repeatedly objected, stating that the exhibit was being misconstrued. The Court called counsel to sidebar, conferred with counsel, and then advised the jury: "[t]here is a dispute, a strong dispute, between counsel as to what the parties said and the significance of those two particular exhibits, it's one of many things you're going to have to sort out, but at this point we're going to proceed ahead." Trial Tr. Vol. XIV at 2383:17-21.[7]

The jury was clearly cautioned about this portion of Plaintiffs' closing argument. Defense counsel's objections were sustained and the Court informed the jury that they would be charged with resolving the disputed evidence during their deliberations. The jury was additionally instructed that the closing arguments of counsel are not evidence. See Final Jury Instructions at Jury Instruction No. 11. While the Court is frustrated that Plaintiffs' closing argument pushed the bounds of appropriate argument, Toyota incurred no prejudice that

---

[7] Toyota also complains of Hilliard's use of a computer animation not admitted as evidence. The animation was momentarily displayed without explanation and was immediately taken off the jury's monitors after directed by the Court.

warrants a new trial.

### ii. Braking

Toyota argues that Plaintiffs' counsel misstated the evidence to the jury in suggesting that Lee experienced "some braking" as he exited the ramp.  Trial Tr. Vol. XIV at 2378:22-2379:1.  According to Toyota, this contradicts Lee's testimony that nothing happened when he pressed the brake pedal, and his belief that the brakes had failed.  Toyota argues that this was used to undermine Toyota's position that Lee inadvertently applied the accelerator instead of the brake pedal.

According to Lee, when he attempted to brake after exiting the interstate, nothing happened.  Trial Tr. Vol. I at 149:22-150:3.  However, the record also reflects that Lee's Camry slowed down as he approached the Snelling Avenue exit, which could reasonably be inferred was due to "some braking."  Coupled with the evidence regarding brake vacuum depletion, Plaintiffs' counsel's "some braking" statement is not an unreasonable inference unsupported by the evidence.  Toyota strongly disputes Lee's assertion that he was attempting to apply the brakes, believing that their pedal application theory is supported by the greater weight of the evidence. The jury, however, chose to not completely accept Toyota's version of events.  Given these reasons, counsel's "some braking" statement was not an unreasonable factual inference and is not grounds for a new trial.

### iii. Throttle Application

The last chain of evidence Toyota contends Plaintiffs' counsel mischaracterized relates to Lee's application of the throttle as he exited the interstate.  According to Toyota, Plainitffs' counsel's mischaracterization was designed to overcome the factual reality that the Camry

accelerated from around 55-60 miles per hour at the interstate exit to 75 miles per hour at impact. Toyota argues there was no evidence that Lee pressed the accelerator pedal at any time while exiting the ramp.  Toyota additionally argues that the evidence reflects the brakes did not malfunction, and thus, if Lee was pressing the brake as he claims he was, the Camry would have slowed down or at least been unable to reach impact speed.

In closing, Plaintiffs' counsel stated:  "His pedal is already set at 60 to 65.  If he pushed it at all, it binds more.  He thinks he's going from zero to 55 or 60 but what he's doing is going from the speed that it stuck up to near open throttle."  Trial Tr. Vol. XIV at 2379:8-11.  During the trial, Lee testified that his foot was "on the gas pedal" as he was going up the ramp.  Trial Tr. Vol. III at 498:17-20; 499:2-4.  Lee also testified that when he saw the cars at the apex of the ramp, he "took [his] foot off the gas and [he] push[ed] on the brake and nothing happened."  Trial Tr. Vol. I at 149:25-150:2.  While Toyota contends his "on the gas pedal" testimony reflects his foot was resting on the pedal, the testimony does not unequivocally reflect that Lee was not applying some amount of pressure on the accelerator pedal.  The jury could have reasonably inferred that "on the gas pedal" did not mean resting without any application of force. The jury also heard expert testimony that under certain conditions, application of the brakes without vacuum power assist would not prevent a vehicle from continued acceleration.  Trial Tr. Vol. XIII at 2223:9-15.  Plaintiffs' argument did not impermissibly misconstrue the evidence and a new trial is not warranted.

### b.  New Theory

Toyota contends that Plaintiffs' counsel argued in his closing argument a previously undisclosed theory that the Camry's throttle could have became stuck somewhere while on

33

Interstate-94 as Lee approached the Snelling Avenue exit.  Toyota asserts this theory is completely unsupported by the evidence and was presented at a time when Toyota lacked any opportunity to respond in substance, heightening the prejudice and therefore warrants a new trial.

Contrary to Toyota's assertion, the record includes evidence that supports the theory argued by Plaintiffs' counsel.  Powers testified that when he experienced his unintended acceleration event, he tapped the accelerator pedal, believing that the pedal was stuck and tapping would free it to return to the idle position.  Trial Tr. Vol. III at 452:1–6.  The jury heard that Powers' tapping actually caused the throttle to stick at a higher speed.  Stilson also testified that if the throttle is stuck, any additional depression of the accelerator pedal will cause the throttle to stick at a higher speed.  Id. 4–6. While this theory was not directly explored with Lee during his testimony, since it is supported by evidence in the record, counsel is not foreclosed from making this argument during closing.  Plaintiffs' counsel's argument on this topic was a reasonable inference from the evidentiary record.  A new trial will not be granted on this ground.

### c.  Send a Message

Toyota also argues that Plaintiffs' counsel used impermissible "send a message" arguments during their closing, imploring the jury to award a large verdict against Toyota. Toyota argues that these statements, coupled with the verdict amounts, is sufficient grounds for a new trial.  Toyota takes issue with the following three statements made by Plaintiffs' counsel:

> (1) [Y]ou can send a message to Mr. Carr before he goes in again to represent Toyota[;]

Trial Tr. Vol. XIV at 2357:22-23;

> (2)  Mr. Carr is going to go to another courtroom one day and he's going to testify again one day for Toyota.  And the lawyer on the plaintiff's side hopefully will have your verdict to hold up in front of

> him. He'll have this record to hold up in front of Mr. Carr so this
> stops here. This stops in this courtroom. This stops with you guys[;]

Id. 2358:5-11; and

> (3) You can't put Toyota in jail. You can't award an eye for an eye,
> you can't take away their health or take away their children. The
> only thing you can do is award compensation to my clients, who've
> been injured, and through that you're telling them and telling the
> world that you know that they have been done wrong and that they
> deserve compensation.

Id. 2400 23-2401:4.

"Improper statements by counsel during oral arguments will constitute reversible error

when those statements are plainly unwarranted and clearly injurious." Morrissey v. Welsh Co.,

821 F.2d 1294, 1303 (8th Cir. 1987) (citing Vanskike v. Union Pac. R.R. Co., 725 F.2d 1146,

1149 (8th Cir. 1984)). Toyota must "show that the statements are unwarranted and make a

concrete showing of prejudice resulting from the argument." Vanskike, 725 F.2d at 1149.

Toyota cites Vanskike v. ACF Indus., Inc. in support of their position. 665 F.2d 188 (8th

Cir. 1981). In ACF Indus., the Eighth Circuit reversed a jury verdict and awarded a new trial

due to improper arguments in closing that "invited the jury both to punish ACF and to deter

others from like conduct." Id. at 210. Here, the first two comments were directed at Toyota's

expert, Lee Carr, not Toyota. The comments were made on the heels of counsel's arguments

challenging the partiality of Carr's testimony. The challenged statements do not directly urge

the jury to send a message to the defendant through a large verdict award but to undermine the

future testimony Carr may give in a future courtroom. They do not justify granting a new trial.

The third comment, the comment about putting Toyota in jail, is also not an

impermissible comment that warrants a new trial. The comment was the answer to counsel's

rhetorical question regarding why two plaintiffs should be compensated from Toyota for their injuries given that many people who have been injured or lost loved ones do not receive compensation.  Read plainly and in context, the challenged statement did not artificially inflate the jury's award through punitive sympathy.

The Court is unconvinced that the three statements Toyota construes as "send a message" statements had any prejudicial impact on the jury's verdict.

### d.  Cumulative Error

Toyota last argues that while small individual errors may not justify a new trial on their own, the cumulative effect of those errors adds up to create a single, large error that necessitates a new trial.  See Morrissey, 821 F.2d at 1304 ("Viewed in isolation, the individual statements by counsel may not have been so prejudicial as to deny defendants a fair trial, but taken as a whole, we believe that the cumulative effects of the numerous improper and inflammatory remarks made by plaintiffs' counsel were prejudicial.").  The Court disagrees.  There is no merit to the suggestion that the errors acted to substantially influence the jury's verdict.  See Williams v. City of Kan. City, Mo., 223 F.3d 749, 755 (8th Cir. 2000) ("Evidentiary errors affect a party's substantial rights when the cumulative effect of the errors is to substantially influence the jury's verdict.").  The jury's verdict was not grossly inflated, implying that it was a product of prejudice.  The crash claimed multiple lives and forever changed the trajectory of two families. The verdict award was not out of step with the tragic consequences resulting from an idle vehicle with four passengers being impacted by a car traveling near 75 miles per hour.  The physical and mental injuries were devastating.  Any errors that may have been committed did not substantially influence the jury's verdict to justify a new trial to cure any prejudice to Toyota.

36

Over the course of the multi-week trial, this jury heard highly emotional testimony including accounts of the pain and death of child victims in this horrific car crash.  The jury also heard days of highly technical testimony about mechanics of car engines and crash dynamics. The case was tried by very experienced and competent attorneys on both sides who specialize in automobile defect cases.  The jury clearly struggled during their five days of deliberation with trying to resolve a case with high damages but a complicated theory to support Toyota's liability. The jury's findings were not without a principled basis, and do not reflect an inflamed or prejudiced jury.  This Court believes the parties were afforded a fair trial which was decided by an impartial jury.

**D.  Toyota's Motions to Stay Execution of Judgment**

Toyota moves to stay execution of the judgment pending disposition of post-trial motions and appeal, pursuant to Federal Rule of Civil Procedure 62(b) and (d).  Toyota asks the Court to waive the supersedeas bond requirement of Rule 62(d), arguing that a bond is not necessary because Toyota clearly has the ability to pay any final judgment in this matter.  Plaintiffs Bridgette Trice and Quincy Adams agree that a stay is appropriate and that the supersedeas bond requirement should be waived, but ask the Court to impose alternative, less costly security.  The Lees argue that the bond requirement should not be waived because Toyota has not proven that it will maintain its financial ability to pay the Judgment.

"The purpose of requiring a supersedeas bond pending appeal is to secure the judgment throughout the appeal process against the possibility of the judgment debtor's insolvency." Olcott v. Del. Flood Co., 76 F.3d 1538, 1559 (10th Cir.1996) (internal quotation marks omitted). Where a judgment debtor will clearly have the continued ability to satisfy the cost of the

judgment, the court may waive the bond requirement.  See, e.g. Dillon v. City of Chi., 866 F.2d 902, 904–05 (7th Cir.1988) (holding the bond requirement inappropriate where "the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money ") (quoting Olympia Equip. Leasing Co. v. W. Union Tel. Co., 786 F.2d 794, 796 (7th Cir.1986)).

Toyota has provided evidence clearly demonstrating its financial capacity to satisfy the Judgment.  Not only does Toyota Motor Corporation have insurance coverage in an amount sufficient to satisfy the Judgment; Toyota Motor Corporation's Annual Report for 2014 shows a net revenue of over 25 trillion Yen (over U.S. $200 billion) and operating income of more than 2 trillion Yen (over U.S. $16 billion).  Borkon Decl., March 4, 2015 [Trice Docket No. 599] ("First Borkon Decl.") Ex. 1 § 3(D) (Initial Disclosures); id. Ex. 2 (Annual Report).  These figures exponentially exceed the amount of the Judgment.  There is no evidence to suggest that Toyota's financial situation will suffer some type of rapid decline in the near future that would render Toyota unable to satisfy the Judgment.  Accordingly, the Motion to Stay Execution of Judgment is granted and the bond requirement is waived.

**E.  Toyota's Motions for Collateral Source Set-Offs, Enforcement of Settlement Releases**

Toyota argues that if the Judgment is allowed to stand, it should be reduced to reflect: (1) set-offs for collateral source payments received by Devyn Bolton, Quincy Adams, and Jemee Lee; and (2) reductions based on pre-suit settlements that some Plaintiffs had reached with Koua Fong Lee.

**1.  Collateral Source Set-Offs**

Toyota asserts that Minnesota's collateral source statute, Minn. Stat. § 548.251, entitles Toyota to offset expenses paid by third parties for the past medical and funeral expenses of

Devyn Bolton, and the past medical expenses of Quincy Adams and Jemee Lee.

The collateral source statute partially abrogates the common law collateral source rule. Graff v. Robert M. Swendra Agency, Inc., 800 N.W.2d 112, 120 (Minn. 2011); Renswick v. Wenzel, 819 N.W.2d 198, 209-10 (Minn. Ct. App. 2012).  Under the common law rule, a plaintiff was allowed to obtain a double recovery for the same injury by receiving payments from third party contributors such as insurers in addition to an award of damages against a tortfeasor. Renswick, 819 N.W.2d at 209.  The collateral source statute alters the common law rule by requiring the district court to reduce damages for injury awarded to a plaintiff when payments have been made to or on behalf of the plaintiff by certain collateral sources.  Do v. Am. Family Mut. Ins. Co., 779 N.W.2d 853, 858 (Minn. 2010).  The primary purpose of the collateral source statute is to prevent plaintiffs from receiving double recoveries.  Imlay v. City of Lake Crystal, 453 N.W.2d 326, 331 (Minn. 1990).

The collateral source statute defines "collateral sources" in relevant part as payments made on a plaintiff's behalf pursuant to:

> (1) a federal, state, or local income disability or Workers' Compensation Act; or other public program providing medical expenses, disability payments, or similar benefits; [or]
>
> (2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage; except life insurance benefits available to the plaintiff, whether purchased by the plaintiff or provided by others, payments made pursuant to the United States Social Security Act, or pension payments . . . .

Minn. Stat. § 548.251, subd. 1(1), (2) (emphases added).

When damages in a civil action include an award to compensate the plaintiff for losses available by collateral sources, a party may file a motion to request a determination of collateral

sources.  Id. subd. 2.  If such a motion is filed, the district court must determine in relevant part:

> (1) amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses except those for which a subrogation right has been asserted.

Id. subd. 2(1) (emphasis added).  The district court must then reduce the damage award by the amounts determined under subdivision 2, clause (1) of the collateral source statute.  Id. subd. 3(a).

### a.  Devyn Bolton

Toyota contends that payments for Devyn Bolton's stipulated medical and funeral expenses are collateral sources which should not be added to the Judgment.

### i.  Medicaid Payments

Devyn Bolton's stipulated medical payments of $1 million were paid on her behalf by DHS and UCare through Minnesota's Medicaid program, also known as Minnesota Medical Assistance ("MA").  Toyota contends the medical expense benefits were made pursuant to a "public program providing medical expenses . . . or similar benefits" and therefore qualify as collateral source payments under Minn. Stat. § 548.251, subd. 1(1).  As such, argues Toyota, they are subject to offset as a collateral source and may not be added to the final judgment.  Toyota's argument fails for at least two reasons.

First, collateral source amounts for which a subrogation right has been asserted are not deducted from a plaintiff's damage award.  See Minn. Stat. § 548.251, subd. 2(1) (providing exception for amounts of collateral sources "for which a subrogation right has been asserted").  "The apparent purpose of the [collateral source statute's] subrogation exception is to ensure that the amount of collateral sources deducted from the award is the amount to which the plaintiff is

actually entitled, and does not include amounts plaintiff must ultimately pay over to a subrogee."

Buck v. Schneider, 413 N.W.2d 569, 572 (Minn. Ct. App. 1987).  Here, Devyn Bolton's

stipulated medical damages must ultimately be paid to UCare and DHS because her rights to

those payments were assigned to those entities at the time she accepted and received MA

benefits.  See Martin ex rel. Hoff v. City of Rochester, 642 N.W.2d 1, 15 (Minn. 2002) ("As a

condition of receiving medical assistance from a state, a medical assistance recipient assigns to

the state . . . the specific claim to recover medical expenses from those responsible for the

injuries."); Minn. Stat. § 256B.056, subd. 6 ("By accepting medical assistance, a person assigns

to the Department of Human Services all rights the person may have to medical support or

payments for medical expenses from any other person or entity . . . .").[8]  To the extent the

assignment was not effective, UCare and DHS have asserted subrogation rights to those

payments.  See Martin, 642 N.W.2d at 21 (stating subrogation appropriate where assignment not

properly made); Minn. Stat. § 256B.37, subd. 1 (providing subrogation rights to state or state's

agent for cost of medical care furnished); Markovits Decl., March 4, 2015 [Adams Docket No.

368] ("First Markovits Decl.") Ex. 3 ("Stevens Aff.") ¶¶ 6, 8-9 (asserting assignment and

subrogation rights on behalf of UCare for payments made pursuant to contract with DHS as part

of MA program); First Markovits Decl. Ex. 4 ("Graupner Aff.") ¶¶ 3-5, 13 (asserting assignment

and subrogation rights on behalf of DHS).  Thus, Devyn Bolton's medical expense payments are

ultimately payable to UCare and DHS as assignees or subrogees of her medical expense claim

---

[8] For the purposes of Minn Stat. § 256B.056, subd. 6, the Department of Human Services includes prepaid health plans under contract with the commissioner.  Minn. Stat. § 256B.056, subd. 6.  Medica and UCare provided medical assistance benefits pursuant to a contract with DHS as part of the state's Medicaid program.  Markovits Decl., March 4, 2015 [Adams Docket No. 368] ("First Markovits Decl.") Ex. 3 ("Stevens Aff.") ¶¶ 6-7.

and are not subject to a collateral source offset.

The second reason the Medicaid payments will not be offset is that the payments were made pursuant to the Social Security Act and thus fall within the exception to collateral sources specified in Minn. Stat. § 548.251, subd. 1(2).  Medicaid was created under Title XIX of the United States Social Security Act.  See Ark. Dep't. of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006) ("The Medicaid program, which provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs, was launched in 1965 with the enactment of Title XIX of the Social Security Act (SSA).").  The Medicaid program created under the Social Security Act is a cooperative federal-state program that pools federal and state funds to finance the costs of medical care for individuals who cannot afford to pay for medical services.  Id. (citing 42 U.S.C. § 1396a).  Each state participating in the Medicaid program administers its own program within federally mandated requirements. Martin, 642 N.W.2d at 9 (citing 42 C.F.R. § 430.0).  A participating state must comply with the requirements of Title XIX of the Social Security Act and the regulations promulgated by the United States Secretary of Health and Human Services.  Norwest Bank of N.D., N.A. v. Doth, 159 F.3d 328, 331 (8th Cir. 1998).

Toyota argues that payments by Minnesota's MA program to health care providers on behalf of participating beneficiaries are not payments made pursuant to the Social Security Act because the payments are:  (1) only partially funded by the Social Security Act, and (2) made under Minnesota's state plan pursuant to Minnesota state law within federal requirements. However, this is precisely how the Medicaid program is designed to function under Title XIX of Social Security Act.  The Medicaid program is structured as a jointly funded health insurance

program that is administered by states within the confines of federal parameters.  The payments

here were made pursuant to this framework.  Thus, payments made by Minnesota's Medicaid

program are "payments made pursuant to the United States Social Security Act."[9]

In addition to complying with the text of the statute, this interpretation adheres to the rule

that "legislation abrogating the common law must be narrowly construed to those circumstances

within the legislature's express abrogation."  Renswick, 819 N.W.2d at 210 (citing Swanson v.

Brewster, 748 N.W.2d 264, 279-80 (Minn. 2010)).  In excepting "payments made pursuant to the

United States Social Security Act" from the collateral sources, the legislature did not expressly

abrogate the common law collateral source rule as it applies to payments made pursuant to the

Social Security Act's Medicaid program.  Therefore, the $1 million in stipulated medical

expenses are not collateral sources under Minn. Stat. § 548.251.

### ii.  Funeral Payments

Toyota has also moved for a determination that $5,700 in funeral expenses paid by the

Minnesota Department of Public Safety Crime Victim Reparations Board ("CVRB") and $907

that had been "written off" are collateral sources.  In response, Bridgette Trice has produced a

letter dated March 17, 2015 from the CVRB asserting a subrogation interest pursuant to

---

[9] At least one state district court in Minnesota has determined that payments made through Minnesota's MA program are not collateral sources to the extent that the payments include federal matching funds that can be traced to Title XIX of the Social Security Act.  Burg v. Sullivan, No. 62-cv-11-2357 (Minn. Dist. Ct., 2d Dist. Oct. 2, 2012) at 4–5.  Based on this rationale, 50% of the Medicaid payments in Burg (the portion attributable to state-provided funds) were determined to be collateral sources.  See id.  However, the exception in the collateral source statute applies to payments "made pursuant to" the United States Social Security Act, not "funded by" the Act.  See Minn. Stat. § 548.251, subd. 1(2).  Therefore, the Court declines to follow the reasoning in Burg and concludes instead that the entire amount of the Medicaid payments are not collateral sources.

Minnesota Statute § 611A.61 in the amount of $6,500.  Trice argues that this subrogation claim causes the funeral expense payments and write-off to be excepted from the collateral source statute in the amount of the subrogation claim.  Thus, argues Trice, only $7 of the $6,507 for which Toyota seeks a collateral source determination may be considered a collateral source.

Minnesota Statute § 611A.61 allows a subrogation interest "to the extent of reparations awarded."  Minn. Stat. § 611A.61.  This subrogation interest falls within an exception in the collateral source statute for payments "for which a subrogation right has been asserted."  Minn. Stat. § 548.251, subd. 2(1).  However, a subrogation claim is limited to the "extent of the reparations awarded."  Minn. Stat. § 611A.61.  Here, the $6,500 subrogation claim asserted in the  March 17, 2015 letter exceeds the amount the CVRB paid for Devyn Bolton's funeral expenses.  The funeral home invoice reflects a payment of $5,600, not $6,500.  Compare Markovits Decl., Apr. 1, 2015 [Trice Docket No. 621] ("Second Markovits Decl.") Ex. 5 (funeral home invoice) with id. Ex. 3 (CVRB letter).  Thus, the CVRB's subrogation claim is limited to $5,600, and the exception within the collateral source statute applies only to this amount.  Accordingly, Toyota is entitled to a collateral source offset for the $907 in funeral expenses that were written off.

### b.  Quincy Adams

Toyota also argues that collateral source payments account for the entirety of Quincy Adams' stipulated medical expenses of $77,894.18.  Of the total amount of stipulated expenses for Quincy Adams, $19,344.01 was paid by Medica through Minnesota's Medicaid program.  Stevens Aff. Ex. C.  As previously explained, Medicaid payments made on behalf of Quincy Adams are not subject to reduction or offset as a collateral source because the Medicaid provider

has obtained assignment or subrogation rights to those payments.  Additionally, payments made under Minnesota's Medicaid program are "made pursuant to the United States Social Security Act" and are therefore not collateral sources under Minn. Stat. § 548.251, subd. 1(2).  Thus, the $19,344.01 in Medicaid payments are not subject to offset or reduction as a collateral source.

The record demonstrates that $7,555.15 of Quincy Adams' medical expenses were paid by "MVA Insurance."  Stevens Aff. Ex. C.  Quincy Adams does not contend that this payment was made pursuant to the Social Security Act.  Therefore, the $7,555.15 payment is a health insurance payment that qualifies as a collateral source under Minn. Stat. § 548.251, subd.1(2) and is subject to reduction from the medical expense damages awarded to Quincy Adams.

The stipulated medical expenses that were not paid by Medica or by MVA Insurance total $50,995.02.[10]  This amount represents Medicare-negotiated discounts to Quincy Adams' medical costs.  See Stevens Aff. Ex. C.  Medicaid benefits in the form of Medicaid-negotiated discounts on medical expenses fall within the exception in the collateral source statutes for payments made pursuant to the Social Security Act.  Cf., Renswick, 819 N.W.2d at 211 (holding that "an injured tort plaintiff's Medicare benefits in the form of payments for medical care or Medicare-negotiated discounts to reduce [the plaintiff's] medical care costs are collateral sources that are excepted from the collateral-source offset provision of Minnesota Statutes section 548.251, subdivision 1," even though this results in a double recovery for the plaintiff).  Thus, the $50,995.02 negotiated discount is not a collateral source.

---

[10] This figure represents the total amount of stipulated medical expenses ($77,894.18), minus expenses paid by Medica ($19,344.01), minus expenses paid by MVA Insurance ($7,555.15).

### c.  Jemee Lee

Toyota contends that if Jemee's damages are not reduced as a matter of law, her judgment should be reduced by $19,768.62 for past medical expenses paid by American Family as Personal Injury Protection ("PIP") benefits.  As discussed above, the damage award to Jemee Lee is not supported by the evidence and Jemee Lee is entitled to no damages.  Therefore, Toyota's request for a collateral source determination is moot with respect to Jemee Lee.

### 2.  Pre-Suit Settlements

Toyota also argues the Judgment must be reduced to reflect certain Plaintiffs' pre-trial settlements with Lee.

In 2007, Plaintiffs Angela Block (on behalf of Jassmine Adams), Quincy Adams, and Bridgette Trice (as mother and guardian of Devyn Bolton) settled their claims against Lee and his insurer.  See Borkon Decl., Feb. 17, 2015 [Trice Docket No. 558] ("Second Borkon Decl.") Ex. 16.  In connection with the settlements, Block received $30,000, Quincy Adams received $17,000, and Trice received $130,000.  Id.  Quincy Adams and Trice also signed Release Agreements that released Lee "and all other persons, firms and corporations" from liability arising from the June 2006 accident.  Second Borkon Decl. Exs. 12, 15.[11]

In February 2013, Jassmine Adams, who was by then an adult, signed a release titled "Pierringer Release and Settlement Agreement" in consideration for the $30,000 she received in 2007.  Reilly Decl. [Trice Docket No. 629] Ex. D.  The Agreement:  (1) releases Lee and

---

[11] Although the record includes a similar Release Agreement pertaining to Jassmine Adams' claims, that Agreement is not executed, and to the best of Jassmine Adams' knowledge a Release Agreement signed by Block does not exist.  See Reilly Decl. [Trice Docket No. 629] Ex. A (unsigned Release Agreement); Pls.'s Mem. Opp'n Toyota's Mot. Amend J. [Block Docket No. 377] 2 n.2.

discharges part of Adams' cause of action equal to Lee's fault; (2) reserves the remainder of Adams' cause of action against Toyota; and (3) states Adams' agreement to indemnify Lee from contribution and indemnity claims made by any non-settling defendants and to satisfy any judgment obtained from Toyota to the extent Lee has been released.  Id.

### a. **Pierringer Release**

Toyota contends that the Pierringer Release and Settlement Agreement signed by Jassmine Adams in 2013 entitles Toyota to a reduction of 40% of her damage award.  Under a Pierringer release, "each joint tortfeasor including the nonsettling defendant is liable only for that part of the award which is his percentage of causal negligence."  Frey v. Snelgrove, 269 N.W.2d 918, 922 (Minn. 1978); Alumax Mill Prods., Inc. v. Congress Fin. Corp., 912 F.2d 996, 1010 (8th Cir. 1990) ("[T]he legal effect of the Pierringer release is that each tortfeasor pays only its proportionate share of liability, and no more.").

A Pierringer release has three basic elements:  (1) the settling defendant is released from the cause of action and a portion of the cause of action equal to the settling party's fault is discharged; (2) the remainder of the causes of action against the non-settling defendants are reserved; and (3) the plaintiff agrees to indemnify the settling defendants from any claims of contribution made by the non-settling defendants and to satisfy any judgment obtained from the non-settling defendants to the extent the settling defendants have been released.  Frey, 269 N.W.2d at 920, n.1.[12]  Under this formula, "the amount collected from a nonsettling defendant

---

[12] The third element may also be satisfied if the plaintiff agrees to release the non-settling defendants from any part of the judgment determined to be the fault of the settling defendants, as this is "functionally equivalent" to an agreement by the plaintiff to indemnify the settling defendants from claims of contribution by the non-settling defendants.  Alumax Mill Prods., Inc., 912 F.2d at 1009.

will represent the full award offset by the amount equivalent to the percentage of liability allocated to the settling defendants." Alumax Mill Prods., 912 F.2d at 1009-10 (quotations omitted); see also Oelschlager v. Magnuson, 528 N.W.2d 895, 898 (Minn. Ct. App. 1995) ("[A] plaintiff who enters into a Pierringer release is limited to recovering that portion of the damages attributable to the non-settling tortfeasor.").

The release agreement signed by Jassmine Adams in 2013 is titled "Pierringer Release and Settlement Agreement" and states: "It is the intention of the parties that this instrument be construed in accord with the principles set forth in Pierringer v. Hoger, 21 Wisc.2d 183, 124 N.W.2d 106 (1963), and Frey v. Snelgrove, 269 N.W.2d 919 (1978)." Reilly Decl. Ex. D. Thus, it is unequivocally a Pierringer release. See Alumax Mill Prods., 912 F.2d at 1008 (stating the parties' intent is crucial to determining whether an agreement is a Pierringer release). The release agreement is also a Pierringer release in substance because it: (1) releases Lee and discharges part of Adams' cause of action equal to Lee's fault, (2) reserves the remainder of Adams' cause of action against Toyota, and (3) states that Adams will indemnify Lee from contribution and indemnity claims made by any non-settling defendants and will satisfy any judgment obtained from Toyota to the extent Lee has been released. See Reilly Decl. Ex. D. Therefore, based on the legal effect of the Pierringer release signed in 2013, Jassmine Adams is limited to recovering the portion of the damages attributable to Toyota, which is 60% of her $4,000,000 award, or $2,400,000.

Jassmine Adams argues that the law concerning Pierringer agreements does not apply here because at the time she accepted $30,000 for her injuries in 2007 she was not aware of her product liability claims against Toyota, and therefore lacked the necessary bargaining power to

negotiate a higher settlement.  This argument fails to recognize that when Jassmine Adams signed the <u>Pierringer</u> release in 2013 she was well aware of—and was several years into prosecuting—the claims against Toyota.  Indeed, the <u>Pierringer</u> release explicitly states that it "is not an agreement to dismiss the suit now pending against the Toyota Defendants."  <u>Id.</u>  Thus, Jassmine Adams was fully cognizant of her claims against Toyota when she agreed to settle and satisfy the "percentage of [her] total claim for damages against <u>all parties</u>" that was equal to Lee's fault.  <u>Id.</u> (emphasis added).

Jassmine Adams also argues that Toyota would be unjustly enriched if the award were reduced, because it would receive a $1,600,000 benefit as a result of her agreement to settle with Lee for $30,000.  However, Jassmine Adams cites no authority for her contention that Toyota will be unjustly enriched by paying 60% of an award for which the jury found it 60% liable.

Accordingly, the Judgment will be amended to give effect to the <u>Pierringer</u> Release and Settlement Agreement by limiting Toyota's liability on Jassmine Adams' claim to its percentage of causal negligence, which is 60% or $2,400,000.

### b.  Non-<u>Pierringer</u> Releases

The Release Agreements signed by Quincy Adams and Bridgette Trice in 2007 are unquestionably not <u>Pierringer</u> releases because the language and terms of the Release Agreements do not express an agreement for the Plaintiffs to indemnify Lee or release non-settling tortfeasors from any part of the judgment determined to be Lee's fault.[13]

---

[13] As discussed above, in a typical <u>Pierringer</u> release, a plaintiff agrees to indemnify the settling defendant against any cross-claims for contribution made by non-settling defendants or to release non-settling defendants from any part of the judgment determined to be the fault of the settling defendants.  <u>Alumax Mill Prods.</u>, 912 F.2d at 1009; <u>Frey</u>, 269 N.W.2d at 920, n.1.

Toyota argues that the damages awarded to Quincy Adams and Bridgette Trice must be reduced by the amounts they received in settlements with Lee and his insurer.  Under Minnesota law, a non-Pierringer release that does not fully compensate a plaintiff "operates as satisfaction *pro tanto* as to other tortfeasors."  Johnson v. Brown, 401 N.W.2d 85, 88 (Minn. Ct. App. 1987); Gronquist v. Olson, 64 N.W.2d 159, 165 (Minn. 1954) ("Therefore, the amount paid by a tort-feasor to whom the agreement is given will be regarded as a satisfaction Pro tanto as to the other joint tort-feasors.").

### i.  Quincy Adams Release

Quincy Adams concedes that the law pertaining to non-Pierringer releases applies to his Release Agreement and entitles Toyota to a *pro tanto* set-off for the amount he received to settle his claims against Lee.  Therefore, the Judgment will be amended to reflect a $17,000 reduction in the award to Quincy Adams based on the settlement payment he received from Lee.

### ii.  Bridgette Trice Release

Bridgette Trice argues that Toyota is not entitled to a *pro tanto* set-off from the award to Devyn Bolton's estate because she signed the 2007 Release Agreement in her capacity as mother and natural guardian of Devyn Bolton, whereas in this litigation she is acting in her capacity as the wrongful death trustee for Devyn Bolton's next of kin.  Toyota responds that regardless of the capacity in which Trice has filed this wrongful death action, the Minnesota Wrongful Death Act limits Trice's action to that which Devyn Bolton could have maintained had she lived.

Minnesota's Wrongful Death Act provides that "[w]hen death is caused by the wrongful act or omission of any person or corporation, the [wrongful death] trustee . . . may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an

injury caused by the wrongful act or omission.  Minn. Stat. § 573.02, subd. 1 (emphasis added).

The parties do not cite, and this Court has not found, a Minnesota or Eighth Circuit case that

applies this language in the context of a pre-death settlement of a decedent's claims.  However,

the Tenth Circuit found in an action brought under Oklahoma's wrongful death statute, which

includes similar wording,[14] that a decedent's personal representative may not maintain a

wrongful death action against a tortfeasor if the decedent settled his action with the tortfeasor

prior to death.  See Huff v. Fireboard Corp., 836 F.2d 473, 476 (10th Cir. 1987).  This

conclusion is consistent with the majority rule that "if an injured person releases his or her

personal injury claims while alive, . . . a subsequent wrongful death action is barred."  Smith v.

Brown & Williamson Tobacco Corp., 275 S.W.3d 748, 771 (Mo. Ct. App. 2008).  Similarly, the

Eighth Circuit has held that under Missouri law, the "one recovery" rule bars a wrongful death

action if the decedent "received satisfaction for the same wrongful conduct—whether by

adjudication or by settlement—during his or her lifetime."  Thompson v. R.J. Reynolds Tobacco

Co., 760 F.3d 913, 916 (8th Cir. 2014).

Here, had Devyn Bolton survived, she would have been entitled to maintain an action

against Toyota, but the 2007 Release Agreement would have "operate[d] as satisfaction *pro*

*tanto*" as to any judgment she may have obtained against Toyota.  Johnson, 401 N.W.2d at 88.

Under Minnesota's Wrongful Death Act, the same limits that would have applied to an action by

Devyn Bolton, had she lived, apply here and limit the wrongful death trustee's recourse against

Toyota to less than full satisfaction of the Judgment.  Thus, Toyota is entitled to a *pro tanto* set-

---

[14] Like Minnesota's Wrongful Death Act, the Oklahoma wrongful death statute permits an action only if the decedent "might have maintained an action, had he or she lived."  12 Okla. Stat. § 1053(A).

off of the $130,000 settlement.

### iii.  Right of Contribution Against Koua Fong Lee

In requesting enforcement of the Release Agreements signed by Quincy Adams and

Bridgette Trice, Toyota also argued in its opening brief that the Judgment should be amended to

reflect Toyota's right of contribution against Koua Fong Lee.  See Defs.' Mem. [Trice Docket

No. 557] 11-12.  Toyota contended that although it remains jointly and severally liable to all

plaintiffs other than Jassmine Adams (who signed a Pierringer release) and Lee, Toyota has a

right of contribution against Lee for 40% of the $10,190,000 in damages awarded to the other

plaintiffs, which equals $4,076,000.  Id.

Lee initially opposed Toyota's asserted claim for contribution, arguing that Toyota failed

to plead a claim for contribution and failed to timely request a determination of the effect that the

Release Agreements would have on a contribution claim.  Pl.-Intervenor's Opp'n Toyota Mot.

[Trice Docket No. 628] 2-13.  In its reply brief, Toyota conceded that its "right of contribution

should be formally pleaded prior to entry of judgment memorializing that right."  Defs.' Reply

Mem. [Trice Docket No. 647] 3 (citing Cosgrove v. McDonnell Douglas Helicopter Co., 847 F.

Supp. 719 (D. Minn. 1994) (denying defendant's request to adjust judgment amount to reflect

right of contribution against joint tortfeasors where defendant had not asserted a counterclaim for

contribution)).  However, Toyota argued that "this procedural prerequisite can be handled now

via a post-verdict amendment of the pleadings, rather than in a separate action for contribution."

Id.

Approximately two weeks after filing its reply brief, counsel for Toyota informed the

Court at an April 30, 2015 hearing in this case that Toyota does not intend to amend its pleadings

and that it will rest on its right to assert a claim for contribution when the claim arises.[15]

Therefore, because Toyota has not formally pleaded a claim for contribution, the issue of

Toyota's right to contribution is not before the Court and will not be addressed in the Judgment.

## F.  Toyota's Motions to Amend Judgment

Toyota moves to amend the Judgment pursuant to Federal Rule of Civil Procedure 59(e).

"Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to

present newly discovered evidence." Matthew v. Unum Life Ins. Co. of Am., 639 F.3d 857, 863

(8th Cir. 2011) (quoting United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 933 (8th

Cir. 2006)).

Toyota asks the Court to amend the Judgment in three respects.  First, Toyota requests

that the Judgment be amended to correctly reflect collateral source and settlement set-offs,

Toyota's reduced liability to Jassmine Adams due to the Pierringer Release, and Toyota's right

of contribution from Koua Fong Lee for 40% of all other damages.  Consistent with the Court's

determinations of these matters in Section III.E., above, the Judgment will be amended to reflect

collateral source set-offs for a portion of Devyn Bolton's funeral expenses and a portion of

Quincy Adams' medical expenses, *pro tanto* reductions to the awards for Quincy Adams and the

Estate of Devyn Bolton based on the Release Agreements, and a 40% reduction in Jassmine

Adams' award to reflect the effect of the Pierringer Release.

Second, Toyota asks that the Judgment be amended to reflect dismissal of the claims of

Angela Block, Bridgette Trice, Javis Adams, Jr., and the Lee children other than Jemee Lee.

---

[15] A contribution claim arises when there is common liability among two or more joint tortfeasors and one joint tortfeasor pays more than its fair share of the common obligation. Grothe v. Schaffer, 232 N.W.2d 227, 232 (Minn. 1975).

This request is not opposed by any party, and dismissal of the claims is appropriate based on the voluntary dismissals and Court rulings in these cases.[16]

Third, Toyota requests that the Judgment be amended to adjudicate all of American Family's rights and claims.  American Family's rights and claims are adjudicated in Section III.K, below, and will be reflected in the Judgment.

## G.  Bridgette Trice's Motion to Amend Judgment

### 1.  Stipulated Medical and Funeral Expenses

Trice asks the Court to amend the Judgment to add stipulated damages for Devyn Bolton's medical and funeral expenses.  As discussed above, Toyota stipulated that Devyn Bolton's medical expenses were $1 million, and the Court has concluded that these expenses are not subject to a collateral source offset.

Toyota argues that the stipulated medical expenses should not be added to the Judgment because Devyn Bolton assigned her right to recover those expenses to the State of Minnesota when she accepted medical assistance.  See Minn. Stat. § 256B.056, subd. 6 ("By accepting medical assistance, a person assigns to the Department of Human Services all rights the person may have to medical support or payments for medical expenses from any other person or entity . . . .").  However, a medical assistance recipient has a right to bring a claim for damages

---

[16] Angela Block filed a Notice of Voluntary Dismissal of the Individual Claims of Angela Block [Block Docket No. 289] on January 6, 2015.  Also on January 6, 2015, Bridgette Trice filed a Notice of Dismissal of Individual Claims [Trice Docket No 511].  The claims of decedent Javis Adams, Jr. were dismissed with prejudice by this Court on March 18, 2014, based on the statute of limitations.  See Mem. Op. & Order, March 18, 2014 [Trice Docket No. 346] 20, 38. The Lees do not object to an order amending the Judgment to reflect dismissal of the claims of their minor children A.P.L., Y.L., and Y.L.  See Pl.-Intervenors' Opp'n Toyota Mot. [Trice Docket No. 628] 2 (stating lack of opposition to an order amending the Judgment to clarify that the claims of the Lee children other than Jemee Lee have been dismissed).

representing state-paid medical damages, even though the recipient has assigned the right to retain those damages.  Brown v. State, 617 N.W.2d 421, 426 (Minn. Ct. App. 2000).  Indeed, "[i]f the individual recipient pursues the liable third party, the state need not expend its limited resources in an effort to recoup its payments."  Id. at 426-27.

Toyota also argues that Devyn Bolton's medical expenses should not be added to the Judgment because UCare and DHS' liens related to the medical expenses were satisfied in connection with a pre-suit settlement between Bridgette Trice (guardian for Devyn Bolton) and Lee.  However, during the trial Toyota agreed that Devyn Bolton's medical damages were $1 million, and that it would be responsible for this amount if found liable at trial.  At trial, Plaintiffs' counsel stated:

> MR. MARKOVITS: [O]n the special verdict form where you'd normally have a line for, for example, funeral expenses and past medical expenses, at [Toyota's counsel's] suggestion we've taken that off with the understanding that the . . . million dollars for Devyn Bolton's estate and medical expenses, Quincy Adams' medical expenses, the funeral expenses have all been stipulated to and Toyota would be responsible for those amounts if Toyota is found liable, but it wouldn't be for the jury to actually pencil them in.
>
> THE COURT: All right.
>                            . . .
> MR. MARKOVITS: With the understanding that we've stipulated to those amounts and that those would be assessed by the Court essentially post-judgment if Toyota were found liable, then we're fine with not putting them on the verdict.

Trial Tr. Vol. XIII at 2268:23–2220:1.

Given Toyota's stipulation to the amount of medical damages and Trice's reliance on this stipulation, Toyota may not now argue that the damages must be excluded based on the supposed satisfaction of UCare and DHS's liens prior to this lawsuit.  Therefore, Toyota is liable for $1

million in medical expenses for Devyn Bolton, and this amount is not subject to offset or reduction as a collateral source.

With respect to Devyn Bolton's funeral expenses, the parties have stipulated that the expenses were $8,660, and the Court has concluded that $907 of this amount is a collateral source that should not be added to the award. Thus, $7,753 in funeral expenses will be added to the award for the Estate of Devyn Bolton.

## 2. Interest

Trice additionally requests that the Judgment be amended to add prejudgment and postjudgment interest on the award to Devyn Bolton's estate.

"In a diversity action, state law governs prejudgment interest; federal law governs postjudgment interest." Happy Chef Sys. Inc. v. John Hancock Mut. Life Ins. Co., 933 F.2d 1433,1435 (8th Cir. 1991).

### a. Prejudgment Interest

Minnesota Statute § 549.09 provides for prejudgment interest as follows:

> (a)    When a judgment or award is for the recovery of money, . . . interest from the time of the verdict, award, or report until judgment is finally entered shall be computed by the court administrator . . . as provided in paragraph (c) and added to the judgment or award.

> (b)    . . . [P]reverdict, preaward, or prereport interest on pecuniary damages shall be computed as provided in paragraph (c) from the time of the commencement of the action or a demand for arbitration, or the time of a written notice of claim, whichever occurs first . . . .
> . . .

> Except as otherwise provided by contract or allowed by law, preverdict, preaward, or prereport interest shall not be awarded on the following:

. . .

(2) judgments or awards for future damages;
. . .

(c) (2)  For a judgment or award over $50,000, . . . the interest rate
shall be ten percent per year until paid.

Minn. Stat. § 549.09, subd. 1.

### i. Past or Future Damages

Toyota argues Trice is not entitled to prejudgment interest because Minn. Stat. § 549.09,

subd. 1(b)(2) prohibits prejudgment interest on future damages, and the award to Devyn Bolton's

Estate does not differentiate between past and future damages.  Future damages are an exception

to the general rule under Minn. Stat. § 549.09, subd. 1 that prejudgment interest shall be added to

a judgment or award for the recovery of money.

The jury awarded damages to The Estate of Devyn Bolton based on the following

question on the Verdict Form:

13.    What amount of money will fairly and adequately compensate Devyn Bolton's
next of kin, Bridgette Trice and Carolyn Trice, for damages suffered by Devyn Bolton
resulting from the accident?

(a)    Loss of counsel, guidance, aid, advice,                 $_____
comfort, assistance, companionship, and
protection Devyn Bolton would have given to her
next of kin, Bridgette Trice and Carolyn Trice, had she lived.

See Verdict.

In answering this question, the jurors were instructed to "determine the amount of money

that will fairly and adequately compensate [the] claimants for the losses they suffered as the result

of this death."  Final Jury Instructions at Jury Instruction No. 28 (emphasis added).  The phrasing

of this instruction in the past tense demonstrates that the jury was to consider past loss in

57

determining damages.  The jury was also instructed to consider factors such as Devyn Bolton's "likely future earning capacity" and "the length of time those related might be expected to survive together," demonstrating that the jury was to also consider future loss.  See id.  On this record, it is not possible to divine whether the jury sought to compensate Devyn Bolton's next of kin for past damages, future damages, or both.  However, most of the loss Devyn Bolton's family would have suffered from her death in 2007 would have been incurred by the time of the trial in 2015.

Additionally, prior to submitting the Verdict Form to the jury, all parties had the opportunity to review the form and suggest changes.  Had Toyota wished for past and future damages to be separated in Question 13, it could have so requested, but it did not.  Thus, the future damages exclusion does not apply and prejudgment interest will be calculated on the entire award.

### ii.  Date Prejudgment Interest Ceases

The parties also dispute when the prejudgment interest period should end.  Trice relies on the provision in Minn. Stat. § 549.09, subd. 1(a) stating that prejudgment interest is computed "until judgment is finally entered" to argue she is entitled to prejudgment interest until the Court enters an amended judgment following the parties' post-trial motions.[17]  Toyota argues that prejudgment interest ceased on February 4, 2015, the date the original Judgment was entered.

The parties do not cite, nor has the Court been able to locate, a Minnesota case addressing

---

[17] The Lees and Jassmine Adams make similar arguments in their reply briefs in support of their Motions to Amend Judgment.  See Pl.-Intervenors' Mem. Supp. Mot. Amend J. [Trice Docket No. 646] 2-6.  Toyota had a full opportunity to present legal arguments and authority on this issue in response to Bridgette Trice's request for prejudgment interest.  See Defs.' Mem. Law Opp'n Mot. Amend J. [Trice Docket No. 622].  Therefore, Toyota is not prejudiced by the Lees' and Jassmine Adams' belated assertions that prejudgment interest continues to accrue until the Court enters a final, appealable Judgment in this case.

when judgment is "finally entered" for the purposes of determining when prejudgment interest ceases to accrue under Minn. Stat. § 549.09, subd. 1(a). Toyota argues a judgment is final when it has been entered on a verdict where damages are meaningfully ascertainable. Trice argues a judgment is not final until a final, appealable order has been entered.

Under either standard, prejudgment interest did not cease when Judgment was entered on February 4, 2015. At that time, all parties understood that the Judgment was not a final, appealable order, because stipulated damages had not been added and collateral source determinations had not been made. Nor were damages meaningfully ascertainable. Not only had collateral source determinations not been made, the effect of the Release Agreements and Pierringer Release on the final damages had not been raised, much less decided. Thus, Judgment was not "finally entered" for purposes of Minn. Stat. § 549.09, subd. 1(a), and prejudgment interest accrues until June 25, 2015, the date Judgment will be entered pursuant to this Order absent the filing of a jurisdictional challenge by Toyota.

### iii. Simple or Compound Interest

Trice also argues that prejudgment interest should be compounded annually. However, Minnesota's prejudgment interest statute refers only to "simple interest per annum" and includes no reference to compounded interest. See Minn. Stat. § 549.09, subd. 1(c). Accordingly, Trice is entitled to prejudgment interest at ten percent per year from June 7, 2010 (the date she served Defendants with a Complaint and Summons) until June 25, 2015. The Court will apply the same end date for prejudgment interest to all prejudgment interest calculations under this Order.

After adjusting the award to the Estate of Devyn Bolton to: (1) add stipulated damages for medical expenses paid by Medicaid and funeral expenses for which a subrogation right is asserted

($1 million), (2) add stipulated damages for funeral expenses ($8,660) less the collateral source offset for the funeral expense write-off ($907), and (3) reduce the award by the amount received under the 2007 Release Agreement ($130,000), the prejudgment interest calculations are as follows:

| Plaintiff | Past Damages | Interest Rate | Number of Years | Prejudgment Interest | Total Judgment Amount |
|---|---|---|---|---|---|
| Bridgette Trice on behalf of Estate of Devyn Bolton | $4,877,753.00 | 10% | 5.0493151 | $2,462,931.20 | $7,340,684.20 |

### b.  Postjudgment Interest

The parties agree that postjudgment interest pursuant to 28 U.S.C. § 1961 should be applied to the Judgment and that the applicable postjudgment interest rate is 0.17 percent compounded annually.

Therefore, the Judgment will be amended to reflect Toyota's liability to Bridgette Trice in the total amount of $7,340,684.20, plus postjudgment interest accruing at a rate of 0.17 percent from June 25, 2015 until the total Judgment amount owed to Bridgette Trice is paid.

### H.  Quincy Adams' Motion to Amend Judgment

### 1.  Stipulated Medical Expenses

Quincy Adams asks the Court to amend the Judgment to include $77,894.18 in past medical expenses.  As discussed above, Toyota stipulated at trial that it would be liable for Quincy Adams' medical expenses in this amount.  The Court has concluded that $7,555.15 of this amount is a collateral source.  Therefore, $70,339.03 in past medical damages will be added to the Judgment.

## 2. Interest

Quincy Adams also asks the Court to amend the Judgment to add prejudgment and postjudgment interest on his award. Prejudgment interest shall accrue at the rate of ten percent per year from June 7, 2010 (the date he served Defendants with a Complaint and Summons) until June 25, 2015. After adjusting the award to Quincy Adams to: (1) add stipulated medical expenses ($77,894.18) less the collateral source offset for the medical expense payment by MVA Insurance ($7,555.15), and (2) reduce the award by the amount received under the 2007 Release Agreement $17,000), the prejudgment interest calculations are as follows:

| Plaintiff | Past Damages | Interest Rate | Number of Years | Pre-Judgment Interest | Future Damages | Total Judgment Amount |
|---|---|---|---|---|---|---|
| Quincy Adams | $803,339.03 | 10% | 5.0493151 | $405,631.19 | $500,000 | $1,708,970.20 |

The parties agree that postjudgment interest applies to the Judgment and that the applicable postjudgment interest rate is 0.17 percent compounded annually.

Accordingly, the Judgment will be amended to reflect Toyota's liability to Quincy Adams in the total amount of $1,708,970.20, plus postjudgment interest accruing at a rate of 0.17 percent from June 25, 2015 until the total Judgment amount owed to Quincy Adams is paid.

## I. The Lees' Motion to Amend Judgment

The Lees request that the Judgment be amended to add prejudgment and postjudgment interest on their awards. In making this request, the Lees correctly assume that Koua Fong Lee's damages award will be reduced by the percentage of fault attributed by the jury prior to calculating interest. See T.H.S. Northstar Assocs. v. W.R. Grace & Co., 66 F.3d 173, 178 (8th

Cir. 1995) (remanding with instructions to reduce judgment by plaintiff's percentage of fault and recalculate prejudgment interest based on reduced judgment amount). The Lees' Motion also properly reflects Nong Lee and Nhia Koua Lee's award is subject to the applicable interest rate of 4% for awards of $50,000 or less. See Minn. Stat. § 549.09, subd. 1(c)(1).[18] Prejudgment interest shall accrue from November 15, 2010 (the date the Lees filed their Intervenor Complaint [Trice Docket No. 63]) until June 25, 2015.

After reducing Koua Fong Lee's award to reflect his contributory negligence, and eliminating Jemee Lee's award based on insufficient evidence, the prejudgment interest calculations are as follows:

| Plaintiff-Intervenor | Past Damages | Interest Rate | Number of Years | Pre-judgment Interest | Future Damages | Total Judgment Amount |
|---|---|---|---|---|---|---|
| Koua Fong Lee | $300,000 | 10% | 4.6082192 | $138,246.58 | $450,000 | $888,246.58 |
| Panghoua Moua | $250,000 | 10% | 4.6082192 | $115,205.48 | $500,000 | $865,205.48 |
| Jemee Lee | $0 | N/A | N/A | N/A | $0 | $0 |
| Nhia Koua Lee | $5,000 | 4% | 4.6082192 | $921.64 | $10,000 | $15,921.64 |
| Nong Lee | $10,000 | 4% | 4.6082192 | $1,843.29 | $15,000 | $26,843.29 |

The parties agree that postjudgment interest applies to the Judgment and that the

---

[18] Minn. Stat. § 549.09, subd. 1(c)(1) provides that "[f]or a judgment or award of $50,000 or less . . . the interest shall be computed as simple interest per annum. The rate of interest shall be based on the secondary market yield of one year United States Treasury bills, calculated on a bank discount basis as provided in this section." The posted yield for United States Treasury bills has been 4% every year since 2010. See http://www.mncourts.gov/district/2?page=1308 (last visited June 15, 2015).

applicable postjudgment interest rate is 0.17 percent compounded annually.

Accordingly, the Judgment will be amended to reflect Toyota's liability to the Lees in the total Judgment amounts specified above, plus postjudgment interest accruing at a rate of 0.17 percent from June 25, 2015 until the total Judgment amount owed to the Lees is paid.

## J.  Jassmine Adams' Motion to Amend Judgment

Jassmine Adams requests that the Judgment be amended to add pre- and postjudgment interest on her award.  Prejudgment interest shall accrue at the rate of ten percent per year from June 2, 2010 (the date she served Defendants with a Complaint and Summons) until June 25, 2015.

After reducing Jassmine Adams' Judgment to give effect to the <u>Pierringer</u> release she signed in 2013, prejudgment interest calculations are as follows:

| Plaintiff | Past Damages | Interest Rate | Number of Years | Pre-Judgment Interest | Future Damages | Total Judgment Amount |
|---|---|---|---|---|---|---|
| Jassmine Adams | $1,200,000 | 10% | 5.0630137 | $607,561.64 | $1,200,000 | $3,007,561.60 |

The parties agree that postjudgment interest applies to the Judgment and that the applicable postjudgment interest rate is 0.17 percent compounded annually.

Accordingly, the Judgment will be amended to reflect Toyota's liability to Jassmine Adams in the total amount of $3,007,561.60, plus postjudgment interest accruing at a rate of 0.17 percent from June 25, 2015 until the total Judgment amount owed to Jassmine Adams is paid.

## K.  American Family's Motion to Amend Judgment

American Family, Lee's automobile insurer, requests the Court to amend the Judgment to reflect Toyota's liability to American Family under the Joint Damage Stipulation [Trice Docket

No. 428] between the parties that was filed with this Court prior to trial.  Additionally, American

Family asks the Court to award prejudgment and postjudgment interest to American Family.

Under the Joint Damage Stipulation, American Family and Toyota agreed that "[t]he total

payment amount of $348,416.72 constitutes AmFam's principal damage claim in this lawsuit."

Id. ¶ 3.  The Joint Damage Stipulation further states that "[i]n the event AmFam prevails at trial

against Toyota (or any of the Toyota Defendants) on liability, AmFam will be entitled to recover

the above stipulated damage amount, from the liable Defendant(s), subject to any applicable

contributory or comparative fault."  Id. ¶ 5.

Toyota agrees with American Family that the Joint Damage Stipulation requires judgment

to be entered against Toyota and in favor of American Family in the amount of $209,050.03,

which has been reduced by the 40% fault attributed to Koua Fong Lee.  The parties also agree that

postjudgment interest applies to the Judgment and that the applicable postjudgment interest rate is

0.17 percent compounded annually.

However, the parties dispute whether American Family is entitled to prejudgment interest.

Toyota argues that the Joint Damages Stipulation states only that American Family may recover

the stipulated damage amount of $348,416.72, not this amount plus prejudgment interest.

American Family disagrees, arguing that the purpose of the Joint Damage Stipulation was to

expedite the trial and memorialize the parties' agreement that American Family had met its

evidentiary burden as to its "principal" damage claim.  Thus, argues American Family, the Joint

Damages Stipulation relates only to the damages American Family would have had to prove at

trial, and prejudgment interest does not fall within this category of damages.

Paragraph 5 of the Joint Damage Stipulation governs the amount American Family may

recover now that Toyota's liability has been established.  That provision reads:  "In the event AmFam prevails at trial against Toyota (or any of the Toyota Defendants) on liability, AmFam will be entitled to recover <u>the above stipulated damage amount</u>, from the liable Defendant(s), <u>subject to any applicable contributory or comparative fault</u>."  <u>Id.</u> ¶ 5 (emphases added).  The Joint Damage Stipulation, which was filed on CM/ECF by counsel for American Family, does not state that American Family may also recover prejudgment interest.  When entering into the Joint Damage Stipulation, American Family was represented by experienced counsel who knew how to protect American Family's right to prejudgment interest.  By not including prejudgment interest in Paragraph 5, which governs what American Family was entitled to recover under the Joint Damage Stipulation, American Family has waived its right to prejudgment interest.  Accordingly, the Judgment will be amended to reflect Toyota's liability to American Family in the total amount of $209,050.03, plus postjudgment interest accruing at a rate of 0.17 percent from June 25, 2015, until the total Judgment amount owed to American Family is paid.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Renewed Motions for Judgment as a Matter of Law [Civil No. 10-2802, Docket No. 345], [Civil No. 10-2804, Docket No. 569], and [Civil No. 10-2805, Docket No. 361] are **DENIED**.

2. Defendants' Motions for New Trial [Civil No. 10-2802, Docket No. 357], [Civil No. 10-2804, Docket No. 589], and [Civil No. 10-2805, Docket No. 373] are **DENIED**.

3. Defendants' Motions for Determination of Collateral Source Set-Offs and Enforcement of Settlement Releases [Civil No. 10-2802, Docket No. 336], [Civil No. 10-2804, Docket No. 555], and [Civil No. 10-2805, Docket No. 352] are **GRANTED** in part and **DENIED** in part, as stated herein.

4.      Defendants' Motions to Amend Judgment [Civil No. 10-2802, Docket No. 363], [Civil No. 10-2804, Docket No. 595], and [Civil No. 10-2805, Docket No. 378] are **GRANTED** in part and **DENIED** in part, as stated herein.

5.      Plaintiff Jassmine D. Adams' Motion to Amend Judgment  [Civil No. 10-2802, Docket No. 350] is **GRANTED** in part and **DENIED** in part, as stated herein.

6.      Plaintiff-Intervenors Koua Fong Lee, Panghoua Moua, Nhia Koua Lee, Nong Lee, and Jemee Lee's Motion to Amend Judgment [Civil No. 10-2804, Docket No. 577] is  **GRANTED** in part and **DENIED** in part, as stated herein.

7.      Plaintiff Bridgette Trice's Motion to Amend Judgment [Civil No. 10-2804, Docket No. 581] is **GRANTED** in part and **DENIED** in part, as stated herein.

8.      Plaintiff Quincy Ray Adams' Motion to Amend Judgment [Civil No. 10-2805, Docket No. 366] is **GRANTED** in part and **DENIED** in part, as stated herein.

9.      Plaintiff-Intervenors American Family Mutual Insurance Company's Motion to Amend Judgment and Motion for Relief from Judgment [Civil No. 10-2804, Docket No. 574] is **GRANTED** in part and **DENIED** in part, as stated herein. American Family shall recover from Defendants $209,050.03.  Postjudgment interest on this amount shall accrue at a rate of 0.17 percent from June 25, 2015, until the total Judgment amount owed to American Family is paid.

10.     Defendants Toyota Motor Corp., Toyota Motor North America, Inc., Calty Design Research, Inc., Toyota Motor Engineering and Manufacturing North America, Inc., Toyota Manufacturing, Kentucky, Inc., and Toyota Motor Sales, USA, Inc. are jointly and severally liable to Plaintiffs and Intervenors in the below amounts, plus postjudgment interest as stated herein:

     a.  Jassmine Adams                   $3,007,561.60

     b.  Quincy Adams                  $1,708,970.20

     c.  Koua Fong Lee                 $888,246.58

     d.  Panghoua Moua                $865,205.48

     e.  Jemee Lee                        $0

     f.  Nhia Koua Lee                   $15,921.64

     g.  Nong Lee                       $26,843.29

      h. The Estate of Devyn Bolton     $7,340,684.20

      i.  American Family Mutual
         Insurance Company       $209,050.03

11.     The individual claims of Angla Block and all claims by or on behalf of Javis Adams, Jr. in Civil No. 10-2802 are **DISMISSED WITH PREJUDICE**.

12.     The individual claims of Bridgette Trice and all claims by or on behalf of A.P.L., Y.L., and Y.L. in Civil No. 10-2804 are **DISMISSED WITH PREJUDICE**.

13.     Defendants' Motions to Stay Execution on Judgment [Civil No. 10-2802, Docket No. 360], [Civil No. 10-2804, Docket No. 591], and [Civil No. 10-2805, Docket No. 376] are **GRANTED**.  Execution on the Judgment is stayed for 30 days from the date of this Order.  Upon any party's filing of a notice of appeal, the stay shall be converted to a stay of execution under Rule 62(d) and shall remain in effect until the last of (a) the issuance of the mandate from the United States Court of Appeals in all appeals and cross-appeals in Civil Nos. 10-2802 ADM/JSM, 10-2804 ADM/JSM, and 10-2805 ADM/JSM; (b) the expiration of the deadline to file for writ of ceriorari in the United States Supreme Court, if no such petition is timely filed; or (c) if a timely petition for writ of certiorari is filed, the last of (i) the denial of the petition(s), or (ii) if the petition(s) are granted, the Supreme Court's decision and issuance of the Eight Circuit's mandate in any proceedings on remand.

14.     Judgment shall be held in abeyance until June 25, 2015.


BY THE COURT:


       s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE


Dated:  June 15, 2015.